Ryan P. Steen, AK Bar No. 0912084
Beth S. Ginsberg, *Pro Hac Vice Pending*
Jason T. Morgan, AK Bar No. 1602010
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, Washington 98101
(206) 624-0900 (phone)
(206) 386-7500 (facsimile)

Connor R. Smith, AK Bar No. 1905046
Stoel Rives LLP
510 L Street, Suite 500
Anchorage, Alaska 99501
(907) 277-1900 (phone)
(907) 277-1920 (facsimile)

*Attorneys for United Cook Inlet Drift Association and
Cook Inlet Fishermen's Fund*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED COOK INLET DRIFT ASSOCIATION and COOK INLET FISHERMEN'S FUND, | Civil Action No.: _____ |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF, AND PETITION FOR REVIEW (42 U.S.C. § 4332; 16 U.S.C. §§ 1801-1891d; 5 U.S.C. §§ 553, 701-706)** |
| NATIONAL MARINE FISHERIES SERVICE; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; GINA RAIMONDO, in her official capacity as the United States Secretary of Commerce; JANET COIT, in her official capacity as Assistant Administrator, National Oceanic and Atmospheric Administration; and JAMES W. BALSIGER, in his official capacity as NMFS Alaska Region Administrator, | |
| Defendants. | |

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

1

## SUMMARY OF ACTION

1.      Plaintiffs have a related action pending in *United Cook Inlet Drift Association, et al., v. National Marine Fisheries Service*, et. al. 3:13-cv-00104-TMB. Plaintiffs have sought relief in that related action to include the allegations below pursuant to Federal Rule of Civil Procedure 15(a)(2) and 15(d). Plaintiffs hereby file this complaint protectively in response to arguments by Federal Defendants in the related action that relief under Civil Rule 15 is not proper or warranted, or otherwise insufficient to satisfy the applicable statute of limitations.

2.      Commercial salmon fishing in Alaska is an important part of the state's cultural heritage and history.  Salmon fishing has supported generations of Alaska fishers and their families and has been the life blood of many rural Alaskan communities and businesses since long before statehood.

3.      The Cook Inlet salmon fishery has historically been one of the nation's most productive salmon fisheries. But during the last two decades, the commercial harvest in Cook Inlet has steadily—and more recently, precipitously—declined.  In the 1980s and 1990s, the sockeye salmon harvest alone ranged consistently from four to nine million sockeye per year.  The 10-year average annual commercial catch from 2008 to 2017 is now down to just 2.7 million sockeye.  The commercial sockeye harvest was about 1.8 million in 2017 and 2019, and the commercial sockeye harvest in 2018 was only 814,516—the worst harvest in over 40 years.  In 2020, the commercial salmon

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

harvest in Cook Inlet reached *a new low*, below 2018, with 669,751 sockeye harvested and 1.2 million total commercial harvest of all five salmon species.  These precipitous declines have all occurred under the exclusive management, control and direction of the State of Alaska.

4.      In 2010, Plaintiffs sought to turn the tide of state mismanagement of the fishery by appealing to the National Marine Fisheries Service ("NMFS") and the North Pacific Fishery Management Council (the "Council"), and asking for the development of a fishery management plan ("FMP") to manage the Cook Inlet salmon fishery in a manner consistent with the National Standards of the Magnuson-Stevens Fishery Conservation and Management Act (the "MSA" or Magnuson-Stevens Act").  NMFS and the Council flatly refused, cynically claiming that they (as the entities entrusted by Congress to manage this nation's fishery resources) lacked the expertise to manage salmon in Alaska (even though they manage salmon in other areas of Alaska).  Instead, in 2012, NMFS and the Council issued Amendment 12 to the *Fishery Management Plan for Salmon Fisheries in the EEZ off the Coast of Alaska* (the "Salmon FMP").  *See* 77 Fed. Reg. 75,570 (Dec. 21, 2012).  Amendment 12 cut the Cook Inlet salmon fishery out of the Salmon FMP altogether and deferred all management authority to the State of Alaska.

5.      Plaintiffs initiated this lawsuit eight years ago against Federal Defendants (collectively NMFS) to challenge Amendment 12. The Ninth Circuit Court of Appeals agreed with Plaintiffs that NMFS's decision to defer management to the State of Alaska in Amendment 12 was illegal.  *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries*

*United Cook Inlet Drift Association, et al. v. NMFS, et al*
3
113095205.1 0014655-00002
Case 3:21-cv-00255-TMB   Document 1   Filed 11/17/21   Page 3 of 52

*Serv.*, 837 F.3d 1055, 1063 (9th Cir. 2016). The Ninth Circuit instructed that NMFS could not "wriggle out of" its duties or "shirk" the statutory command to produce an FMP for the Cook Inlet salmon fishery. *Id.* at 1063, 1064. Moreover, the Ninth Circuit rejected NMFS's argument that the Magnuson-Stevens Act "does not expressly require an FMP to cover an entire fishery." *Id.* at 1064. Furthermore, the "Act makes plain that federal fisheries are to be governed by federal rules in the national interest, not managed by a state based on parochial concerns." *Id.* at 1063. As this Court explained, the Ninth Circuit "held that Magnuson-Stevens Act requires" the Council "to create an FMP for each entire fishery under its authority that requires conservation and management." Dkt. 168 at 2-3.

6. The Ninth Circuit decision in September of 2016 initiated a five-year administrative process that NMFS, the Council, and the State of Alaska turned into a complete farce. At the last minute, the Council completely abandoned its efforts to create a federally delegated or a federally managed FMP program for the Cook Inlet salmon fishery. Instead, at the urging of the State of Alaska (and with help from NMFS), the Council proposed an amendment ("Amendment 14") that closes commercial salmon fishing in federal waters altogether, relinquishes and defers all management decision for the Cook Inlet salmon fishery to the State of Alaska. This is precisely the opposite of what the Ninth Circuit instructed. NMFS proceeded to draft language for Amendment 14 for the Council, reviewed and approved Amendment 14, and issued final regulations

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

4

implementing Amendment 14 on November 3, 2021. *See* 86 Fed. Reg. 60,568 (Nov. 3, 2021).

7.     The NMFS decision to close the commercial salmon fishing in federal waters will have immediate and disastrous consequences on commercial processors and fishers, their families, and the communities and business that depend on salmon fishing in Cook Inlet. The closed area in Cook Inlet has been an essential part of commercial fishing in Cook Inlet for over 100 years.  As one Alaska legislator explained, Amendment 14 "will likely put an end to commercial fishing in Cook Inlet, and therefore, and Alaskan way of life."

8.     As discussed more fully below, Amendment 14 and its implementing regulations, like its predecessor Amendment 12, are arbitrary, capricious, and contrary to the Magnuson-Stevens Act, 16 U.S.C. §§ 1801-1891d; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706.

9.     Even worse, the process associated with Amendment 14 demonstrates that the Council and NMFS were not acting in good faith during the remand of Amendment 12.  Public records show that members of the Council were actively trying to avoid the application of federal standards to the Cook Inlet salmon fishery.  The Commissioner for the Alaska Department of Fish and Game, Doug Vincent Lang, a member of the Council, expressed concern that the Council would "take actions to bring state management in federal waters in line with federal standards" under the Magnuson-Stevens Act.  Behind

the scenes, and outside the public process, Commissioner Lang developed a political strategy based on the supposed "State Right to Manage" the fishery, and in opposition to "federal or outsider influence." Without informing the public or stakeholders, Commissioner Lang determined that the state was "unwilling" to accept a delegated management authority in Cook Inlet (even though it accepts delegated management authority for other fisheries) and left stakeholders and Council staff to continue on a fool's errand trying to develop a delegated program that the state had predetermined it was never going to accept. This fact was not disclosed by the state until after the close of public comment in December 2020, and immediately before the state called for a vote to close the fishery. NMFS is complicit in this scheme, as staff were aware of the state's plan, and not only stayed silent on the issue, but actively advised State of Alaska representatives to omit the rationale related to the "State's sovereign rights over management of the salmon fisheries" from the record before the Council, and replace it with a pretextual explanation ostensibly related to salmon conservation. This is not fair dealing.

10. For all these reasons, and those discussed below, Plaintiffs respectfully request this Court to vacate the decision approving Amendment 14 and its implementing regulations, and seek an order requiring NMFS to comply with the MSA and develop an appropriate FMP that covers Cook Inlet. Plaintiffs request the Court to declare that Amendment 14, its underlying implementing regulations, and NMFS's NEPA Finding of No Significant Impact ("FONSI") are arbitrary, capricious, and an abuse of discretion;

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

not in accordance with law; and in excess of statutory jurisdiction, authority, or limitations. Plaintiffs further seek an order vacating Amendment 14 and its underlying implementing regulations, and the FONSI, and remanding to Defendants under the prescriptive supervision of this Court as set forth in the Request for Relief below.

## PARTIES

### Plaintiffs

11.     Plaintiff United Cook Inlet Drift Association ("UCIDA") is a corporation in good standing registered under the laws of the State of Alaska. UCIDA represents the economic, social, and political interests of drift gillnet fishermen and their families in Cook Inlet, Alaska. UCIDA currently has approximately 200 members who hold limited-access salmon driftnet fishing permits, issued by the State of Alaska, in Cook Inlet. UCIDA membership ranges across 27 different states and one foreign country.

12.     UCIDA's members make their living by commercial fishing. UCIDA's members hold State of Alaska limited-entry permits (meaning additional permits can no longer be issued and are fully allocated), which authorize them to catch all five species of salmon: sockeye, coho, chinook, chum, and pink. The majority of drift gillnet fishing by UCIDA's members in Cook Inlet occurs within federal waters in the exclusive economic zone ("EEZ").

13.     Drift gillnet boats are small-scale fishing operations, typically crewed by one to three persons. Each fishing operation represents a substantial investment in the boat, gear, and the permit itself. Each boat is generally allowed to deploy a single 900-

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

foot-long gillnet. The gillnet is suspended in the water column by floats (called "corks") as the boat drifts with the current—hence the name "drift gillnet." After the gillnet is allowed to "soak" in the water for a length of time (as the boat and net drift with the current), the gear is hauled in, and the fish are removed and placed on ice in the boat's hold. Those fish are then transported to, and offloaded at, one of Cook Inlet's local seafood processors in fishing communities such as Kenai, Kasilof, Ninilchik, or Homer. After processing, these salmon are delivered throughout the United States and around the world.

14.     In addition to permit holders, UCIDA has approximately 30 Associate members including fish processors, gear suppliers, crew members, and other interested members of the community.

15.     UCIDA's mission is to promote public policy that facilitates the science-based and orderly harvest of Cook Inlet salmon in a manner that is economically and ecologically sustainable and that protects commercial salmon fishing in Cook Inlet as a viable way of life. UCIDA and its members are committed to the protection of the environment of Cook Inlet, and to ensuring that its marine resources are both managed and conserved to enhance the health and productivity of the ecosystem. To that end, UCIDA has advocated in state and federal forums for management of these stocks in a manner consistent with the goals and objectives of the MSA, including management consistent with the MSA's Maximum Sustainable Yield ("MSY") principles (MSY is defined at 50 C.F.R. § 600.310(e)(1)(i)(A) as the largest long-term average catch or yield

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

that can be taken from a stock or stock complex under prevailing ecological, environmental conditions).  The relief UCIDA seeks in this lawsuit is germane to its organizational purpose.

16.     Plaintiff Cook Inlet Fishermen's Fund ("CIFF") is a non-profit corporation registered under the laws of the State of Alaska.  CIFF has 446 members, including commercial fishermen of all gear types, seafood processors, and community members.  The majority of CIFF's members are from Alaska, but CIFF also has members from 21 other states.

17.     CIFF's mission is to advocate on behalf of all commercial fishermen of Cook Inlet and for the coastal community more generally.  CIFF's members and volunteers are fueled by the desire to save the commercial fishing industry in Cook Inlet as well as all of Alaska.  The relief CIFF seeks in this case is germane to its organizational purpose.

18.     Plaintiffs, directly or through their members, fully participated, to the limited extent allowed by NMFS and the Council, in the proceedings predating the decisions challenged in this lawsuit.  Plaintiffs submitted detailed written comments and testimony on Amendment 14 and its implementing regulations and the accompanying draft environmental assessment ("EA").

19.     Plaintiffs have standing to bring this action because their members are directly and adversely impacted by Amendment 14 and its implementing regulations, which close fishing in federal waters in Cook Inlet and improperly defers and

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

relinquishes all management decisions for the Cook Inlet salmon fishery to the State of Alaska. Plaintiffs and their members are also adversely impacted by Defendants' failure to comply with the procedural requirements of NEPA and the MSA. The challenged agency decisions are final and ripe for review by this Court.

## Defendants

20.     NMFS is an agency of the National Oceanographic and Atmospheric Administration ("NOAA"), U.S. Department of Commerce. NMFS is sometimes referred to as NOAA Fisheries. Among its duties, NMFS is responsible for managing commercial marine fisheries to ensure sustainable harvests that provide the greatest overall benefit to the nation pursuant to the MSA.

21.     Defendant Gina Raimondo is the Secretary of the U.S. Department of Commerce and is sued in her official capacity. Secretary Raimondo directs all business of the Department of Commerce, including NOAA and its agency, NMFS. Through these agencies, Secretary Raimondo is ultimately responsible for the approval of Amendment 14, its implementing regulations, and the EA and corresponding FONSI, and is further responsible for the Department of Commerce's compliance with federal law, including NEPA, the MSA, and the APA.

22.     Defendant Janet Coit is the Assistant Administrator for NMFS and is sued in her official capacity. The Secretary of Commerce has delegated responsibility to the NOAA Administrator to ensure compliance with NEPA, the MSA, and the APA, and to promote effective management and stewardship of the nation's fisheries resources and

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

assets to ensure sustainable economic opportunities. The NOAA Administrator, in turn, has subdelegated this responsibility to NMFS.

23. Defendant James Balsiger is the Administrator of the NMFS Alaska Region and is sued in his official capacity. Dr. Balsiger also is a voting member of the Council and participated in the remand process leading to the development of Amendment 14. Dr. Balsiger drafted Amendment 14, and then reviewed and approved Amendment 14 on behalf of NMFS.

## JURISDICTION AND VENUE

24. This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgments), 28 U.S.C. § 2202 (injunctive relief), and 16 U.S.C. §§ 1855(f) and 1861(d) (MSA).

25. Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1855(f).

26. Plaintiffs have exhausted all administrative remedies.

27. Venue is properly vested in this Court under 28 U.S.C. § 1391 because Plaintiffs' principal place of business is in this district, and a substantial part of the acts or omissions giving rise to this controversy occurred in this district.

## STATUTORY FRAMEWORK

### The Magnuson-Stevens Fishery Conservation and Management Act

28. The MSA is the primary domestic legislation governing management of federal fisheries. 16 U.S.C. §§ 1801-1891d.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

11

29.     The MSA created eight regional fishery management councils that are primarily charged with preparing FMPs and plan amendments for each managed federal fishery.  *Id.* § 1852(a)(1).

30.     The MSA requires an FMP for each fishery under the regional council's jurisdiction "that requires conservation and management."  *Id.* § 1852(h)(1).  The FMP is the foundational document for management of each fishery and provides the framework for ensuring that fisheries are managed in a manner consistent with the requirements of the MSA and its National Standards.

31.     The MSA's purpose is to put these national fishery resources under "sound management" and "to realize the full potential of the Nation's fishery resources."  *Id.* § 1801(a)(5)-(6).  This includes both conservation measures to prevent overfishing, as well as a "national program for the development of fisheries which are underutilized or not utilized by the United States fishing industry."  *Id.* § 1801(a)(7).

32.     The MSA gives special attention to anadromous species such as salmon.  Indeed, the MSA's stated purpose is "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the *anadromous species* . . . of the United States."  *Id.* § 1801(b)(1) (emphasis added).

33.     The Council manages fisheries in the EEZ off Alaska's coast.  Prior FMPs developed by the Council govern the management of salmon fisheries, including but not limited to the salmon fisheries, in which Plaintiffs' members participate.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

34.     The authority of a state to manage fisheries in the EEZ, beyond the state's territorial waters (three miles for purposes of MSA), is constrained by the MSA.  The state may regulate all fishing activities in the adjacent portions of the EEZ only to the extent that the applicable FMP delegates such authority.  *Id.* § 1856(a)(3).  Absent such delegation through an FMP, the state may only regulate vessels registered under the laws of that state in the EEZ.

35.     Fishery management councils submit proposed FMPs and FMP amendments to the Secretary of Commerce for review and approval.  *Id.* §§ 1853, 1854.  All FMPs, and FMP amendments, must be consistent with the requirements of the MSA, including the 10 National Standards set forth in the MSA.

36.     The MSA's National Standards guide all FMPs and MSA regulations.  For example, National Standard 1 requires FMPs to prevent overfishing while achieving the optimum yield from each fishery for the U.S. fishing industry.  *Id.* § 1851(a)(1).  National Standard 2 requires that all conservation measures be based on the best scientific information available.  *Id.* § 1851(a)(2).  National Standard 3 provides that fisheries should be managed as a unit throughout their range, where practicable.  *Id.* § 1851(a)(3).  National Standard 4 requires that any allocation of fishing rights be "fair and equitable" to fishermen and "shall not discriminate between residents of different States." *Id.* § 1851(a)(4).  National Standard 7 requires conservation measures to, where practicable, minimize costs and unnecessary duplication.  *Id.* § 1851(a)(7).  National Standard 8 requires conservation measures to take into account the importance of the fishery

resources to fishing communities, to provide for the sustained participation of, and to minimize impacts on, such communities. *Id*. § 1851(a)(8). National Standard 10 requires conservation measures to promote the safety of human life at sea. *Id*. § 1851(a)(10).

37. The Secretary of Commerce, acting through NMFS, must disapprove an FMP amendment to the extent it is inconsistent with provisions of the MSA or any other applicable law.

38. The Secretary of Commerce must also approve all regulations that implement an FMP. *Id*. § 1854(b). The Secretary must give notice of proposed rulemaking and provide an opportunity for public comment on proposed regulations. *Id*.

39. Any fishery management regulation implementing an FMP must be consistent with the MSA, including the 10 National Standards for fishery management and conservation. *Id*. §§ 1854(b), 1851(a).

## The National Environmental Policy Act

40. Approvals of FMPs, FMP amendments, and implementing regulations are subject to NEPA requirements, 42 U.S.C. § 4321, *et seq*.; 16 U.S.C. § 1854(i).

41. Congress established NEPA as "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (1978) (amended July 16, 2020). NEPA and its implementing regulations require that federal agencies, including NMFS, must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see* 40 C.F.R. § 1501.3–6 (2020). The purpose of NEPA is to ensure that federal decision-making is

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

fully and publicly informed through a reasonably thorough and thoughtful analysis of the probable environmental impacts resulting from a proposed federal action, and through identification and analysis of a reasonable range of alternative actions, including the no-action alternative.  In enacting NEPA, Congress sought to ensure that federal agencies take a hard look at the environmental consequences of any proposed action and required agencies to comply with NEPA "to the fullest extent possible."  42 U.S.C. § 4332.

42.    NEPA requires that a federal agency proposing a major federal action with significant environmental effects prepare a detailed statement, which must include the environmental impacts of and alternatives to the proposed action.  *Id.* § 4332(2)(C)(i)-(iii).  This detailed written statement is an EIS.  *See* 40 C.F.R. § 1508.1(j) (2020).

43.    To determine whether an EIS is necessary, an agency may first prepare an EA.  *See id*. §§ 1501.5(a)–(c), 1508.1(h) (2020).  An EA is a "concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an [EIS] or a [FONSI]."  *Id*. § 1508.1(h) (2020).  An EA must contain sufficient information and analysis to determine whether the proposed action is likely to have significant impacts, thus requiring preparation of an EIS.  *See id*. §§ 1501.5(a)–(c), 1508.1(h) (2020).  An EA must consider a reasonable range of alternatives, and must include a reasonably thorough discussion of the direct, indirect, and cumulative impacts of the proposed alternative. *See* § 1501.5(c)(2) (2020).

44.     If an agency concludes, based on the EA, that an EIS is not required, it must prepare a FONSI, which explains the agency's reasons for its decision.  *Id*. §§ 1501.6(a)–(c), 1508.1(l) (2020).

45.     The analysis of alternatives should present the environmental impacts of the proposed action and the alternatives based on the information and analysis presented. *Id*. § 1502.14 (2020).  The analysis must evaluate reasonable alternatives to the proposed action, identify a "no action" alternative, discuss in detail each alternative considered, and discuss the reasons alternatives were eliminated from detailed study.  *Id*. § 1502.14(a)–(f) (2020).  These alternative analysis requirements also apply to EAs.  *See* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1501.5(c)(2) (2020).

### The Administrative Procedure Act

46.     The APA provides for judicial review of final agency action by persons "aggrieved" by such action.  5 U.S.C. § 702.  The actions reviewable under the APA include any "preliminary, procedural, or intermediate agency action or ruling . . . on the review of the final agency action."  *Id*. § 704.

47.     The APA also provides standards applicable when a federal agency proposes and adopts final rules and regulations.  *Id*. §§ 553, 551(4).  Specifically, agencies must provide "[g]eneral notice" of any "proposed rule making" to the public through publication in the Federal Register.  That notice must include: "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

16

proposed rule or a description of the subjects and issues involved." *Id*. § 553(b). An agency's responsibility to consider public comments on a proposed rulemaking is required by 5 U.S.C. § 553(c).

48. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." *Id.* § 706(2)(D).

## STATEMENT OF FACTS

### The Cook Inlet Salmon Fishery

49. Upper Cook Inlet is home to five species of anadromous salmon—chinook, sockeye, coho, pink, and chum—as well as steelhead trout. These are some of the largest natural, wild returns of salmon in the nation. And unlike many of our nation's fisheries that are fully utilized (or even overutilized), Cook Inlet salmon stocks are largely underutilized. For example, in 2014 an estimated 20 million pink salmon returned to Cook Inlet, but state restrictions limited harvest to 642,754 fish, with *15 million pink salmon not utilized* and not needed for biological purposes. This happened again in 2020.

50. The Kenai River sockeye runs in Cook Inlet, in particular, are world-class, with the potential to produce millions of adult sockeye returns annually. These sockeye are also genetically unique, with an unusual variety in the age and large size of adult returning stocks.

51.    The commercial fishery on these Cook Inlet anadromous stocks dates back to at least 1882, utilizing all manner of gear types, from fishwheels to driftnets.  The federal government expressly recognized the national importance of maintaining this commercial fishery in 1952 when it negotiated by treaty to exclude Cook Inlet from an international treaty banning most net fishing activities outside of state waters.

52.    Commercial fishing in Upper Cook Inlet is currently limited to two gear types (set and drift gillnets) and occurs on all five Cook Inlet anadromous salmon stocks. East side set net operations deploy gillnets from fixed locations near shore, anchored to the bottom, and commonly extending in sections as far as one and half miles offshore. West side set net operations are commonly extended up to 5 miles off shore. Northern District set net operations commonly extend up to 10 miles off of the northern inlet shores.  Drift gillnets, by contrast, are deployed from small vessels.  Each drift gillnet is approximately 900 feet long.

53.    The majority of commercial fishing harvest in Upper Cook Inlet is on sockeye.  The vast majority of the commercially caught Cook Inlet salmon find their way to grocery stores and restaurants in the United States.  Cook Inlet salmon are an important and healthy part of the nation's food supply.

54.    The Cook Inlet salmon fishery is highly competitive and requires conservation and management.

**The 1990 Salmon FMP**

55.    The last major revision to the Salmon FMP was in 1990.  The 1990 Salmon FMP has two management areas: the East Area and the West Area.  The border between the two areas is the longitude of Cape Suckling.

56.    The 1990 Salmon FMP addressed commercial salmon fishing in the East and West Areas differently.  In the East Area (which consists primarily of coastal waters off southeast Alaska), the 1990 FMP set forth the Council's management goals and objectives.  The 1990 FMP delegated management of East Area fisheries, consistent with the Council's management goals and objectives, to the State of Alaska.

57.    In the West Area, by contrast, the 1990 Salmon FMP provided little guidance on how to manage salmon.  Instead, the 1990 Salmon FMP closed the vast majority of the West Area to commercial fishing, consistent with prohibitions in the International Convention for the High Seas Fishery of the North Pacific Ocean ("High Seas Convention").  Also consistent with the High Seas Convention, the 1990 FMP exempted from this closure three historic net fisheries: Cook Inlet, Prince William Sound, and the Alaska Peninsula area.  The EEZ portion of Cook Inlet open to fishing is a contiguous area of approximately 1,100 square miles.  The 1990 Salmon FMP did not expressly delegate management to the State of Alaska or set clear management goals or objectives for the West Area.

58.    The High Seas Convention was repealed and replaced in 1992 by the North Pacific Anadromous Stock Act of 1992, which contained no provisions for management of the three historic net fisheries areas.  Despite the change in the law, the Council took

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

no action to make changes to the FMP to clarify for the West Area how it was to be managed for nearly 20 years.

### The State of Alaska's Management of the Cook Inlet Salmon Fishery

59.     The State of Alaska has managed the salmon fisheries in Alaska since 1960. As a condition of statehood, Alaska was allowed to manage the Cook Inlet salmon fishery provided that "the Alaska State Legislature has made adequate provision for the administration, management, and conservation of said resources in the broad *national interest*." Alaska Statehood Act, Pub. L. No. 85-508 § 6(e), 72 Stat. 339, 341 (1958) (emphasis added). The State of Alaska sets its fishery management policies through the Alaska State Board of Fish, and implements those management policies through the Alaska Department of Fish and Game.

60.     The State of Alaska manages salmon in Cook Inlet based on a series of state management plans without Federal oversight.  Generally speaking, these management plans set escapement goals for salmon.  An escapement goal, in this context, is the number of salmon that the state has determined is necessary or desirable to "escape" past a fishery and, thereby, provides spawning stock for successive generations or meets other needs.

61.     The state management plans also include allocation decisions.  Allocation decisions are generally made by setting the number of fishing days, including time and area, allowed for a particular gear type during the season.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

62.     In season, the state manages these fisheries based on assessments of run strength, as measured against desired escapement goals.  In theory, if the run strength is estimated to be larger than normal, then more fishing days are authorized to avoid exceeding maximum escapement targets.  If run strengths are estimated to be smaller than normal, then fewer fishing days are authorized to avoid dropping below minimum escapement targets.  These run strength assessments are based on preseason forecasts, test boat data, and other factors.  Fishing in the EEZ, including test boat fishing in the EEZ, is essential to proper management of the commercial harvest in Cook Inlet.

63.     Setting science-based escapement goals for salmon is essential to a well-managed fishery.  If an escapement goal is set too low, then the fishery gets overfished and run strengths diminish over time.  If an escapement goal is set too high, then the harvestable surplus is lost.  Where too many salmon escape and spawn, the fitness of that run may also be diminished in future years due to density-dependent effects and other biological and ecological factors.  That is especially the case for sockeye, where rearing space and food supply in the lakes and rivers are a limiting factor.  Over-escapement events can reduce run strengths for two or three successive years.

64.     The state has two basic kinds of escapement goals: biological and sustainable.  Biological escapement goals are intended to achieve the MSY (human consumption for that fishery as a food resource).  Sustainable escapement goals, by contrast, are based on historical data showing that a certain harvest level can be sustained.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

21

In Upper Cook Inlet, only one salmon stock has a biological escapement goal. This goal has not been peer reviewed or set for MSY as required by MSA and National Standard 1.

65. Beginning in 2000, the state imposed a "Sustainable Salmon Fisheries Policy" ("SSFP") intended to ensure the long-term viability of salmon runs in Alaska.

66. The state has affirmatively stated that it is under no obligation to comply with the MSA in making its fishery management decisions. Indeed, the state's record has shown that it has not managed the fisheries, especially the fisheries in Cook Inlet, in a manner consistent with the MSA.

67. In 1990, when the last Salmon FMP was created, the state typically managed the salmon fisheries in accordance with the MSA. Beginning in 1996, the state began departing from MSA management. And, when the state subsequently adopted the SSFP, it no longer made any attempt to manage fisheries in Cook Inlet under MSA standards.

68. During the last two decades, the commercial harvest in Cook Inlet has steadily—and more recently, precipitously—declined. In the 1980s and 1990s, the *sockeye* salmon harvest alone ranged consistently from four to nine million sockeye per year. The Secretary declared a fishery disaster in Cook Inlet in 2012 due to the commercial salmon fishery failure. The commercial sockeye harvest was about 1.8 million in 2017 and 2019, and commercial sockeye harvest in 2018 was only 814,516—the worst harvest in over 40 years. The 2018 total commercial harvest of *all five* salmon species was approximately 1.3 million salmon: 61% less than the most

recent 10-year average (already reduced) annual harvest of 3.4 million fish. In 2020, the commercial salmon harvest in Cook Inlet reached a new low below 2018 with 669,751 sockeye harvested and 1.2 million total commercial harvest of all five salmon species. Petitions for disaster declarations for the 2018 and 2020 commercial seasons are currently pending with the Secretary.

69.     The decline in harvest and disaster requests are a direct result of mismanagement by the State of Alaska because of unnecessary restrictions on the commercial fisheries, preventing the harvest of millions of surplus salmon annually. State management in 2021 provides an example. In 2021, the State of Alaska missed the high end of already overinflated escapement goals for sockeye on the Kenai and Kasilof Rivers and Fish Creek by allowing a *surplus* of 1,447,618 sockeye to escape. This wasted surplus *was larger than the entire commercial sockeye harvest* for Upper Cook Inlet in 2021 of 1,403,017 sockeye. The state wasted more sockeye than it allowed to be harvested.

70.     Accompanying this period of historically low salmon harvest is the state's decision to gradually restrict the commercial fishery year after year, with most openings now being severely geographically limited to only a narrow band, preventing the fishery from targeting areas where salmon congregate. Commercial drift fishing historically occurred predominately in the EEZ, but state restrictions have progressively pushed fishing efforts out of this essential fishing area. At the same time, the state has continued to increase "escapement" levels to record high (and likely unsustainable) levels in order

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

to guarantee more than enough fish for the sport fishers to catch and to stock the state resident-only personal use fishery with hundreds of thousands of fish.[1]  Even with inflated escapement targets, the restrictions on commercial fishing are so significant that the state still regularly exceeds those escapement goals by a wide margin (e.g., the Kenai in-river sockeye goal has been exceeded nine out of the last 10 years).

71.  The state restrictions have resulted in severe financial hardship to the U.S. citizens participating in the Cook Inlet commercial salmon fishery, as well as the businesses that rely on the commercial harvest.  Twenty years ago, Cook Inlet had 23 major salmon processors willing to purchase and prep salmon for the wholesale and retail markets, including both international markets and local food stores throughout America.  Presently, there are only two major salmon processors left in Cook Inlet.

72.  Importantly, these state restrictions are based not on science or sound principles of species conservation and fishery management, but rather on other "allocative purposes," like "mak[ing] sport fisheries more enjoyable."  In fact, as a result of the state's over-escapement approach, the increasing *sport* fishery (and the resident-only personal use fishery) has harmed Cook Inlet salmon by causing "serious in-river habitat degradation problems such as hydrocarbon pollution and turbidity levels that exceed clean water standards, and miles of trampled riverbanks."  Millions of salmon go

---

[1] For example, the in-river escapement goal for sockeye in the 1980s and early 1990s (when the fishery was doing very well) was 400,000 to 700,000.  ER 384.  By 2011, the state ratcheted that goal to 1.1 million to 1.35 million, with no underlying biological basis for the change.  *Id*.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

unharvested every year while the commercial fleet is sidelined, to the detriment of Plaintiffs' members, local fishing communities, and the national interest in this important food source as expressed by the Magnuson-Stevens Act.

73.     As noted above, only one salmon stock in Cook Inlet is claimed to have a biologically-based escapement goals.  Many runs in Cook Inlet have no escapement goal of any kind.  There are no escapement goals for pink salmon, only one tributary with escapement goals for chum, and two tributaries with escapement goals for coho.  Of the 35 chinook tributaries, only seven have any escapement goals or monitoring data, and most of those seven are listed under the state designation of "stock of concern."

74.     State management in Cook Inlet has destabilized the fishery.  As a result, many seafood processors have simply quit doing business in Cook Inlet, citing a hostile business environment created by state mismanagement as the reason.  In recent decades, the commercial catch of salmon in Cook Inlet has declined as a result of state management decisions.  Harvests of some stocks have declined as much as 50% due to state management.  Every year, millions of salmon (worth tens of millions of dollars to local and national communities and businesses), above and beyond those necessary to meet biological needs, go unharvested due to state mismanagement.

### Amendment 12 to the Salmon FMP

75.     In 2007, Congress amended the MSA to require all fishery management councils to amend their FMPs to "establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual

specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15). Congress gave the fishery management councils a deadline of "fishing year" 2011 to accomplish this goal for any fishery that was not being overfished. *Id.* § 1853 note.

76. In 2010, the Council began the process of amending the Salmon FMP to comply with this statutory deadline. Plaintiffs, and their members, fish processors, and community leaders from Cook Inlet enthusiastically participated in the Council's process. Plaintiffs explained in public testimony and written comments that the salmon fisheries in Cook Inlet were experiencing significant management concerns that have resulted in reduced run strengths, wasted harvests, and reduced salmon quality. Plaintiffs further explained that the state was not managing this fishery in a manner consistent with the MSA, as conceded by the state who affirmatively represented that it was not obligated to do so. Accordingly, Plaintiffs asked the Council to update the FMP for the West Area, provide management goals and objectives for Cook Inlet and annual catch limits (or an appropriate proxy for annual catch limits) as required by the MSA, and then delegate management to the state consistent with these goals and objectives. This is precisely what the Council proposed to do (and did) for the federal salmon fisheries in the East Area, and Plaintiffs explained that similar measures were necessary to address ongoing management concerns in Cook Inlet.

77. Plaintiffs also offered to work with the Council, and with Defendants, to secure funding to carry out those tasks.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

78. Instead of granting Plaintiffs' request or working with the commercial salmon fishing groups to address their concerns, Council members told Plaintiffs that their belief that the Council could provide them any help was "naive and misguided" or "ill-founded, at best." The Council emphasized that the "National Marine Fisheries Service does not have the expertise . . . to effectively manage salmon fisheries," and that it was naive to expect that the federal agencies could help the state achieve the optimum yield required by the MSA or help stabilize unpredictability in the management of the fishery.

79. Instead of complying with Congress's annual catch limit requirement, the Council, with the support of Defendants, adopted Amendment 12 to the FMP, which provided no annual catch limits for Cook Inlet. Instead of including annual catch limits in the Salmon FMP for Cook Inlet, the Council redrew the map of the West Area to withdraw Cook Inlet from inclusion in the West Area and the Salmon FMP altogether. In so doing, the Council effectively abdicated all federal responsibility for managing salmon in Cook Inlet, contrary to the MSA.

**NMFS Approves Amendment 12 and Issues a FONSI**

80. The Council submitted Amendment 12 and its implementing regulations to NMFS for approval in December 2011. On April 2, 2012, NMFS published a notice of Amendment 12 in the Federal Register and solicited public comment. 77 Fed. Reg. 19,605 (Apr. 2, 2012). On April 11, 2012, NMFS published a notice of the draft rules

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

implementing Amendment 12 and solicited public comment.  77 Fed. Reg. 21,716 (Apr. 11, 2012).

81.    Plaintiffs submitted comprehensive comments on Amendment 12, the proposed implementing regulations, and the draft EA on May 29, 2012.

82.    Plaintiffs explained that the Council's decision to remove Cook Inlet from the Salmon FMP was arbitrary, capricious, and contrary to law and asked the Defendants to reject Amendment 12 and its implementing regulations as inconsistent with the requirements of the MSA.

83.    Plaintiffs also submitted detailed comments on the errors in the EA, the failure of the EA to comply with NEPA and its implementing regulations, and the need for a full EIS.

84.    On June 25, 2012, NMFS issued its final EA and FONSI, concluding that Amendment 12 would have no significant impact on the environment.

85.    The final EA and FONSI concluded that no EIS was necessary.

86.    The final EA and FONSI did not consider the alternative of treating Cook Inlet differently from the other federal fisheries in the West Area.

87.    On June 29, 2012, NMFS approved Amendment 12 to the FMP in a one-paragraph letter.  The letter explained that regulations to implement Amendment 12 would follow at a later date.  Under the MSA, such regulations must be issued within 30 days after the end of the public comment period.  16 U.S.C. § 1854(b)(3).

88.     On December 21, 2012, nearly four months after the statutory deadline to issue final regulations expired, NMFS published its notice of approval of the regulations implementing Amendment 12.  The decision relies primarily on National Standards 3 and 7 as its justification for removing Cook Inlet from the Salmon FMP.

## Ninth Circuit Finds Amendment 12 Contrary to MSA

89.     In 2013, UCIDA filed its initial complaint in this action with the district court, challenging NMFS's decision to remove the Cook Inlet salmon fishery from the Salmon FMP.  UCIDA alleged that the decision violated NMFS's statutory obligation to prepare an FMP "for each fishery under its authority that requires conservation and management." *Id.* § 1852(h)(1).  NMFS argued, *inter alia*, that the Magnuson-Stevens Act allows NMFS to "cede regulatory authority to a state over federal waters that require conservation and management simply by declining to issue an FMP" and "does not expressly require an FMP to cover an entire fishery."  *United Cook*, 837 F.3d at 1062, 1064.  In September 2016, the Ninth Circuit issued an opinion rejecting NMFS's argument and siding with UCIDA.

90.     The Ninth Circuit disagreed with NMFS's argument that it could simply "defer" management to the state.  The Ninth Circuit explained that "the federal government cannot delegate management of the fishery to a State without a plan, because a Council is required to develop FMPs for fisheries within its jurisdiction . . . *and then to manage those fisheries 'through' those plans.*"  *Id*. at 1063 (emphasis added).  The court also made clear that a purpose of the FMP requirement was to ensure "that federal

*United Cook Inlet Drift Association, et al. v. NMFS, et al*
29
113095205.1 0014655-00002
Case 3:21-cv-00255-TMB   Document 1   Filed 11/17/21   Page 29 of 52

fisheries are to be governed by federal rules in the national interest, not managed by a state based on parochial concerns." *Id*.

91.     Next, the Ninth Circuit rejected NMFS's argument that an FMP need not cover an entire fishery.  The court explained that "fishery[] [is] a defined term" and that NMFS's view, if accepted, would allow it to "fulfill its statutory obligation by issuing an FMP applying to only a single ounce of water in that fishery." *Id*. at 1064.  The court stated that Congress "did not suggest that [the] Council could wriggle out of this requirement by creating FMPs only for selected parts of those fisheries, excluding other areas that required conservation and management." *Id*.  In short, the Ninth Circuit instructed that (1) NMFS must prepare an FMP consistent with the federal standards set forth in the Magnuson-Stevens Act that reflect the national interest and (2) the FMP must address the entire Cook Inlet salmon fishery.

## The Remand Process and Amendment 14

92.     Amendment 14 is the Council and NMFS's response to the Ninth Circuit's mandate.  Throughout the remand process, NMFS and the Council repeatedly attempted to find new ways to wriggle out of their statutory duty.  Throughout most of the process, NMFS and the Council were considering three proposed alternatives on remand—*none* of which would comply with the Ninth Circuit's holding or the MSA.

93.     Alternative 1 is to produce no FMP amendment.  This is not a viable alternative given the Ninth Circuit's decision.

94.     Alternative 2 would parse the fishery into separate "state" and "federal" components, and then manage the fish only when they are in federal waters.  But the court already rejected the argument "that § 1851(h)(1) does not expressly require an FMP to cover an entire fishery," explaining that "fishery" is a "defined term" and that NMFS could not provide "FMPs only for selected parts of those fisheries."  *Id.*  Alternative 2 also proposed to defer to the state as to what management is needed in federal waters, allowing the state to decide how many fish are caught, who gets to fish, and where, when, and how fishing will occur.  This violates both the Magnuson-Stevens Act, which requires these elements to be decided by NMFS, and the court's instruction that NMFS and the Council must develop an FMP according to "federal rules in the national interest" so that the fishery is "not managed by a state based on parochial concerns." *Id.* at 1063.

95.     Alternative 3 would also parse the fishery into separate "state" and "federal" components, and manage the fish only when in federal waters.  This alternative would set its own federal standards for fish while in federal waters but makes that federal management plan entirely subservient to the state segment of the fishery.  Fishing would occur in federal waters *if, and only if*, the state allows it.  If the state decides to "allocate" the entire harvestable surplus to state needs (like having more than enough fish for sport fishers or for state resident-only personal use fishers), then Alternative 3 simply could close the separate federal fishery.  This subservient approach plainly elevates parochial concerns over national interests and defies this Court's instruction that the FMP must cover the entire "fishery" as defined in the MSA.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

96.     NMFS and the Council never meaningfully engaged with their core obligations, as set forth by the Ninth Circuit.  Instead, they repeatedly mischaracterized what commercial fishers were asking for as preemption.  But commercial fishers simply want a management plan that covers salmon stocks throughout their range to ensure management of those stocks of fish consistent with the National Standards.  This is not a request for "preemption" as NMFS erroneously states; it is precisely what NMFS's own regulations require: "[t]he geographic scope of the fishery, for planning purposes, should cover the entire range of the stocks(s) of fish, and not be overly constrained by political boundaries." 50 C.F.R. § 600.320(b).

97.     Throughout the remand, the Council and NMFS disregarded the stakeholder process.  The Council took an inordinate amount of time (nearly a year) just to create a stakeholder Salmon Committee.  The members of the Salmon Committee worked diligently for many months to develop a functional and workable alternative (Alternative 2) that would create an FMP amendment to delegate management of the fishery to the State of Alaska under a federal plan.  The Salmon Committee made one primary recommendation to the Council, that the Council consider an FMP amendment that covers the *entire* fishery as required by the Ninth Circuit's decision.  The Council refused to even analyze that alternative and instead dissolved that Committee altogether.  As one Council member conceded, the commercial fishers "put their faith in the Council process, participated like professionals [in] the salmon FMP committee," but "this process failed to serve them."

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

32

98.     The Council process failed because the State of Alaska and Commissioner Lang, sitting as the state's representative on the Council, had a different agenda. While stakeholders worked in good faith to find a way to make a delegated program under Alternative 2 work, the state had decided (without telling the public) that it was unwilling to accept a delegated program at all. The state did not disclose that it was unwilling to accept a delegated program until after the close of public comment at the Council hearing on December 7, 2020, four years into the remand process. Even worse, the state's failure to disclose its position on Alternative 2 distracted and diverted stakeholders from making efforts to develop Alternative 3, the only potentially viable option for the fishery in light of the state's (undisclosed) refusal to accept delegation.

99.     Public records reveal that Commissioner Lang intended to use his role on the Council to avoid compliance with the Magnuson-Stevens Act and the results of the Ninth Circuit decision. In an internal email, Commissioner Lang notes that UCIDA had "convinced a federal court to order the Council to take action." But Commissioner Lang did not want the Ninth Circuit decision to open the state's management to "federal and outsider influence" that comes with an FMP. Instead, he developed a policy rationale based on the "State Right to Manage." He explained that "we cannot support the establishment of a process that requires annual federal and Council review and oversight of our fisheries and their management." He further explained that closure of the fishery in federal waters is "the only option" for "preserving state management" and preventing "federal incursion into this and other state-managed fisheries." Under any other option,

he explains, the Council would "take actions to bring state management in federal waters in line with federal standards." In Commissioner Lang's view, the "side effects" of compliance with federal fishery management standards "could kill us."

100.   In furtherance of the "State Right to Manage" agenda, Commissioner Lang (acting through Deputy Commissioner Rachel Baker), in October 2020, asked the Council to consider a new alternative (Alternative 4) that would result in closure of the Cook Inlet salmon fishery in federal waters. The motion to add Alternative 4 (made by Deputy Commissioner Baker) was made after the close of public comment and just two months before the Court-ordered deadline. Deputy Commissioner Baker proposed Alternative 4 as a potential policy choice that would help with a "transparent analysis" of the alternatives. But Deputy Commissioner Baker failed to disclose the state's unwillingness to accept a delegated program or the underlying "State Right to Manage" rationale.

101.   Meanwhile, between the October Council meeting and the December 7, 2020, Council meeting, NMFS helped the state carry out its anti-Magnuson-Stevens Act rationale for Alternative 4. NMFS was given advance drafts of the state's motion to select Alternative 4, including express statements that Alternative 4 "maintains the States sovereign rights over management of the salmon fisheries." NMFS staff suggested removing that language because "this statement could receive some pushback." That offending language was scrubbed and replaced with conservation pretexts created at the last minute on the advice of NMFS. As Deputy Commissioner Baker explained in an

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

34

email to Commissioner Lang on December 3, 2020, written *four* days before the Council

voted, "NOAA General Counsel provided some suggestions for building the record, the

main outstanding issue is the need to identify conservation benefits that outweigh costs of

closing the EEZ to commercial fishery participants."  Although aware of this issue, and

the state's plans to refuse to accept any federally delegated program, NMFS never

informed the public of the state's rationale.  Neither did other Council members who

were actively coordinating support for Alternative 4 outside the public process.

102.   Alternative 4 was uniformly opposed by the public.  NMFS received 225

written comments and 35 oral testimonies; all (except one) were in opposition to the new

Alternative 4.  The opposition included all commercial fishers as well as state legislators,

local city governments, community development associations, economic development

associations, and environmental protection groups.  After the close of public comments at

the December 7, 2020, Council meeting, the state announced to the public for the very

first time that it refused to accept any delegated federal management for salmon in Cook

Inlet.  The state's newly articulated objection to delegated management was not credible

given that the state is currently subject to a delegated management program for salmon in

the East Area under the Salmon FMP and has willingly accepted a delegated program for

many other fisheries in Alaska (e.g., cod, scallop, and crab).  With Alternative 1 (no

action) precluded by the Ninth Circuit's holding, Alternative 2 rendered infeasible by the

state's announcement, and Alternative 3 not fully developed, the Council voted for

Alternative 4.  Notably, NMFS's representative to the Council, Dr. Balsiger, abstained, citing "litigation" concerns.

103.    During the Council meeting in December 2020, the Council neither reviewed nor adopted an FMP amendment.  Instead, the Council adopted Alternative 4 as "the preferred alternative."

104.    It was not until sometime after the Court-ordered deadline of December 31, 2020 that NMFS even began drafting an FMP amendment to implement Alternative 4.  In a letter dated March 2021, the NMFS Regional Director, Dr. Balsiger, provided the first draft FMP framework.  Dkt. 180-1 at 1-2.  The letter indicates that the Council had yet to make any decisions on what the FMP amendment would look like and had not yet made important decisions on the essential Magnuson-Stevens Act requirements of any FMP, including annual catch limits, maximum sustained yield, or optimum yield.  *Id*.  Without any public process, stakeholder input, or Council discussion, NMFS drafted Amendment 14 for the Council.  *Id*.

105.    NMFS then engaged in a sham "review" process of an Amendment that NMFS itself wrote.  NMFS described the FMP Amendment 14 drafted by *NMFS* as the *Council's* amendment and misleadingly asserted that the Council "submitted" that amendment to NMFS for review on May 14.  Dkt. 181-1 at 2.  NMFS Regional Director Balsiger then reviewed and approved what he referred to as the "Council's" Amendment 14, with the Regional Director approving his own work on August 12, 2021.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*
36
113095205.1 0014655-00002
Case 3:21-cv-00255-TMB   Document 1   Filed 11/17/21   Page 36 of 52

106. NMFS proposed regulations implementing Amendment 14 on June 14, 2021. 86 Fed. Reg. 29,977 (June 4, 2021). The public comment period closed on July 6, 2021. By statute, NMFS was required to issue a final rule within 30 days, by August 5, 2021. 16 U.S.C. § 1854(b)(3). NMFS did not issue its final rule on Amendment 14 until November 3, 2021.

## FIRST CLAIM FOR RELIEF

### (Failure to Comply with Ninth Circuit's Decision on Amendment 12)

107. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

108. Plaintiffs have not yet received the relief they are entitled to under their original complaint and the holding of the Ninth Circuit in *United Cook*.

109. MSA Section 304(a) and (b), 16 U.S.C. § 1854(a)-(b), requires Defendants to ensure FMPs and implementing regulations are consistent with the requirements of the MSA.

110. Plaintiffs' original complaint alleged that NMFS violated Section 304(a) and (b) because NMFS's decision to remove the Cook Inlet salmon fisheries from the Salmon FMP is contrary to the express purpose of the MSA regarding anadromous stocks, and express requirements that an FMP is necessary "for each fishery under its authority that requires conservation and management," because the Cook Inlet salmon fishery clearly requires conservation and management. *Id.* § 1852(h)(1). The Ninth Circuit agreed.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

111. On remand, Defendants try to achieve the same result under a different guise. Amendment 14 closes the fishery in federal waters and relinquishes complete management control for the Cook Inlet salmon fishery to the State of Alaska. But this is just a different way to shirk the same duty.

112. Moreover, under Amendment 14, NMFS continues to defer management decision for sport fishing within federal waters in Cook Inlet to the State of Alaska without delegation through an FMP. This is directly contrary to the Ninth Circuit's instruction.

113. The Ninth Circuit instructed that the Magnuson-Stevens Act "makes plain that federal fisheries are to be governed by federal rules in the national interest, not managed by a state based on parochial concerns" and further explained the FMP must cover the entire fishery. *United Cook*, 837 F.3d 1063. Amendment 14 violates these basic instructions. It improperly segregates the fishery into multiple parts, provides no management for most of the fishery, and turns all harvest decision for the entire fishery over to the State of Alaska. This alone is reason to reject Amendment 14.

114. Furthermore, Defendants' remand process involved numerous procedural irregularities and failures to comply with the Council's Statement of Organization, Practices, and Procedures by failing to disclose key information such as the state's refusal to accept a delegated program in a manner that allowed for meaningful public comment and participation, failing to identify a preferred alternative or preliminary preferred alternative before taking final action, drafting Amendment 14 for the Council and

*United Cook Inlet Drift Association, et al. v. NMFS, et al*
38
113095205.1 0014655-00002
Case 3:21-cv-00255-TMB   Document 1   Filed 11/17/21   Page 38 of 52

deciding key elements of Amendment 14 for the Council without going through the public process, and proceeding to engage in a sham review process by and approving Amendment 14 (written by NMFS) as if it were written by the Council.

115.   By continuing to refuse to comply with the MSA as held by the Ninth Circuit, NMFS has both prejudiced and injured Plaintiffs' rights and interests, and Plaintiffs have no other adequate remedy at law.  For these reasons, Plaintiffs are entitled to the relief requested below.

## SECOND CLAIM FOR RELIEF

### (Violation of the MSA and the APA—Amendment 14)

116.   Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

117.   The MSA allows judicial review pursuant to the APA, 5 U.S.C. § 706(2)(A), (B), (C), or (D).  16 U.S.C. § 1855(f)(1)(B).  Those provisions of the APA authorize reviewing courts to set aside federal agency action that is arbitrary, capricious, and an abuse of discretion, in excess of statutory limitations, or without observance of the procedures required by law.

118.   MSA Section 304(a) and (b), 16 U.S.C. § 1854(a)-(b), requires Defendants to ensure FMPs and implementing regulations are consistent with the requirements of the MSA.

119.     In addition to and including all of the reasons set forth above, Amendment 14 violates the MSA, and should be set aside under the APA for at least the following reasons:[2]

a.     NMFS and the Council failed to follow the established procedures for developing Amendment 14.  These include (1) violation of the Council's Statement of Organization, Practices, and Procedures by failing to disclose key information such as the state's refusal to accept a delegated program and failing to identify a preferred alternative or preliminary preferred alternative before taking final action; (2) the Council's failure to present Amendment 14 to the scientific and statistical committee, and the Council's failure to set required measures prior to final action; (3) NMFS's decision to write Amendment 14 for the Council and set the annual catch limits, maximum sustained yield, and optimum yield for the Council without going through the public Council process or without Council approval; and (4) Dr. Balsiger's review and approval of the Amendment that he wrote, as if he were reviewing the work of the Council.

b.     Amendment 14 fails to comply with the MSA's statutory requirement to provide an FMP for each entire fishery under its jurisdiction that requires conservation and management.  Amendment 14 improperly bifurcates the Cook Inlet salmon fishery into artificial state and federal components and then fails to

_____

[2] Plaintiffs filed detailed comments on Amendment 14 detailing the legal flaws. Those comments are attached to this Complaint and incorporated herein.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

provide management for the state component, or for all fishing activities in the federal component.

c.    Amendment 14 is a capricious and punitive closure that was motivated and adopted for political reasons instead of for compliance with National Standards of the Magnuson-Stevens Act, and is the product of bad-faith decision-making by NMFS and the Council.  Amendment 14 was proposed by the State of Alaska to support a hidden state's rights agenda and avoid "outsider influence" from NMFS, and NMFS was aware of and complicit in that anti-Magnuson-Stevens Act agenda.

d.    Amendment 14 arbitrarily fails to account for the negative impact that the fishery closure will have on the state's ability to manage the fishery.  It is well established that the State of Alaska cannot properly manage the commercial salmon fishery in Cook Inlet if the EEZ portion of the fishery is closed.  In order to assess in-season run strength, the State of Alaska relies on test boat fishing (operated under a state-issued commercial license) in the Cook Inlet EEZ near the southern line of the commercial fishery management area, as well as early catch data from the drift fleet in the EEZ to calibrate the test boat data and assess the in-season run strength.  Without these tools (both of which are foreclosed by Amendment 14), the state will have no way of assessing the in-season run strength.  By the time fish reach state waters near natal streams, it is too late to assess the run and harvest the salmon that are excess to spawning needs. The test fishery harvest numbers in addition to the drift fishery harvest numbers are used to

calibrate run size so that over-fishing will not occur on early or small returns. Without the EEZ fishery, over-escapement of salmon will increase, the predictability of the salmon harvest will decrease, processors will not have a reliable source of product, and both the industry and the resource will suffer. The Council was presented with unanimous testimony from stakeholders, legislators, and cities confirming that closing the EEZ portion of the fishery will completely ruin the commercial fishery in Cook Inlet. It was arbitrary and capricious for NMFS to approve the closure under these circumstances.

e.      Amendment 14 also fails to comply with the Magnuson-Stevens Act's statutory requirements for closing a fishery. Under 16 U.S.C. § 1853(b)(2)(C), an FMP may designate areas where fishing is closed, but the FMP must "ensure" that a closure "(i) is based on the best scientific information available; (ii) includes criteria to assess the conservation benefit of the closed area; (iii) establishes a timetable for review of the closed area's performance that is consistent with the purposes of the closed area; and (iv) is based on an assessment of the benefits and impacts of the closure, including its size, in relation to other management measures (either alone or in combination with such measures), including the benefits and impacts of limiting access to: users of the area, overall fishing activity, fishery science, and fishery and marine conservation." Amendment 14 does not meet any of these requirements. The best scientific information available shows that closure will have an enormous negative impact on the fishery and its

participants, and will have either no appreciable conservation benefits or actually harm conservation of the resource. Moreover, the Council's proposed Amendment to the FMP lacks "criteria to assess the conservation benefit of the closed area" and a timetable to review performance of the closed area.

f.  Amendment 14 also runs afoul of National Standard 1. National Standard 1 requires that an FMP achieve optimum yield, which is defined both in terms of the "greatest overall benefit to the Nation" as well as achieving the MSY. Amendment 14 does not ensure either requirement is met. It turns complete control for all harvest levels over to the State of Alaska to do as it pleases with the fishery, while precluding the state from using essential management tools (harvest in the EEZ) to properly manage that fishery. The Council and NMFS never conducted a stock assessment for the nearly 1,300 stocks of salmon in Cook Inlet, and the FMP purports to conduct *no annual stock* assessments of the stocks moving forward. Simply put, the Council and NMFS do not know what the "maximum sustained yield" is for Cook Inlet salmon stocks and do not plan to find out.

g.  NMFS decision to allow the state to set escapement goals also violates the Magnuson-Stevens Act's required use of the Scientific and Statistical Committee ("SSC"). 16 U.S.C. § 1852(g)(1)(B). Magnuson-Stevens Act establishes the SSC to "provide its Council ongoing scientific advice for fishery management decisions, including recommendations for

acceptable biological catch, preventing overfishing, maximum sustainable yield, . . . and reports on stock status and health, bycatch, habitat status, social and economic impacts of management measures, and sustainability of fishing practices."  Amendment 14 bypasses the SSC and puts those ongoing decisions in the hands of the State of Alaska.  This is not what Congress intended in passing the Magnuson-Stevens Act.

h.      Amendment 14 is also not supported by the "best scientific information" available as required by National Standard 2.  This fishery closure is not based on science at all, but based on politics.  Moreover, the draft EA/RIR abruptly cuts off its analysis of the fishery impacts in 2018, thereby omitting the dismal harvest in 2019 and the disastrous harvests in 2020.  This information was available to NMFS and the Council but not used.  This missing information was critical to the decision to close the fishery in the EEZ because much of the reduced harvest in 2019 and 2020 was the result of needless state closures of fishing opportunities in the EEZ.  Restrictions on fishing in the EEZ in 2020, despite relatively high abundance of salmon returns, resulted in a fishery disaster with the average drift permit holder grossing only about $4,400 for the entire season.  Complete closure of the EEZ will be far worse.  Likewise, NMFS and the Council failed to utilize the best available science in other respects in evaluating the efficacy of the State of Alaska's escapement-based

management program (Appendix 13) by using a data set that ended in 2010, cutting off the last 10 years of available information on salmon returns.[3]

i.      Amendment 14 also violates National Standard 3, which requires that "[t]o the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination."  Closure of the EEZ fishery does not "coordinate" management of stocks or manage them as a unit.  It simply abdicates all federal responsibility to the state to manage the fishery in state waters however it deems fit.

j.      Amendment 14 also violates National Standard 4, which requires that all allocations "not discriminate between residents of different states." Here Amendment 14 effectively allocates the entire fishery to the State of Alaska.  The State of Alaska does, in fact, discriminate against out-of-state fishers, including by establishing an Alaska resident-only dipnet fishery that harvests hundreds of thousands of salmon per year to the detriment of other users of the resource.

k.      Amendment 14 also violates National Standard 8, which requires that conservation measures "take into account the importance of fishery resources to fishing communities" using the best scientific data available, and to "(A) provide for the sustained participation of such communities,

_____

[3] Appendix 13 was also not peer reviewed.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

and (B) to the extent practicable, minimize adverse economic impacts on such communities." As noted above, NMFS and the Council have not relied on the best available information related to impacts of the fishery closure, including omission of data related to the last two years of harvest. The closure required by Amendment 14 will not provide for sustained participation of fishing communities; it will wreak economic hardship on those communities and have severe consequences on the viability of commercial salmon fishing in Cook Inlet as expressed in public comment (but ignored by the Council) by the City of Kenai, the City of Homer, State Senator Peter Micciche, State Representative Sarah Vance, the United Fisherman of Alaska, the Cook Inlet Aquaculture Association, Cook Inletkeeper, the Homer Marine Trades Association, the North Pacific Fisheries Association, the Kenai Peninsula Fishermen's Association, Pacific Star Seafoods, Salmon State, and hundreds of commercial fishers.

l.      Amendment 14 is also contrary to National Standard 10, requiring consideration of safety of life at sea, as it would concentrate more vessels and gear in smaller nearshore areas where there is a greater risk of collision and increased risk of vessels and gear hitting "erratic" boulders (large submerged boulders in the nearshore area).

m.      The Council's decision to adopt Amendment 14 is also contrary to the MSA because it was driven by a Council stated policy "to facilitate

State of Alaska salmon management in accordance with the Magnuson-Stevens Act, Pacific Salmon Treaty, and applicable Federal law."   There are two fatal problems with this policy.  First, the facilitation of State of Alaska management is not a "policy" goal of the Magnuson-Stevens Act.  The state's role is to participate through the Council process, not as a substitute for the Council, and the Council's policy is contrary to the intent of the Magnuson-Stevens Act by elevating state interests over national interests.  The Ninth Circuit has already explained that this is improper.  Second, the State of Alaska is assuredly not managing salmon in Alaska "in accordance with the Magnuson-Stevens Act."  UCIDA submitted detailed comments showing precisely why the state's process for setting escapement goals does not comply with the Magnuson-Stevens Act.  The Magnuson-Stevens Act requires the Council to set annual catch limits for each fishery based on peer-reviewed SSC recommendations.  State of Alaska management plans that affect harvest levels or ACLs are based on flawed escapement goals set by politically appointed Alaska Board of Fisheries members.

120.    Amendment 14 is arbitrary, capricious, and contrary to the MSA, and NMFS's approval of Amendment 14 has both prejudiced and injured Plaintiffs' rights and interests, and Plaintiffs have no other adequate remedy at law.  For these reasons, Plaintiffs are entitled to the relief requested below.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

## THIRD CLAIM FOR RELIEF

## (Violation of NEPA and the APA)

121.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

122.    NEPA requires that federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA requires an agency to take a hard look at the environmental consequences of a proposed action, including by disclosing and analyzing the significance of all direct, indirect, and cumulative environmental impacts of each alternative. 40 C.F.R. §§ 1502.14, 1502.16 (2020). The agency's analysis must include accurate scientific analysis, expert agency comments, and public scrutiny. *Id.* §§ 1502.23, 1501.5 (2020); 40 C.F.R. § 1500.1(b) (1978) (amended July 16, 2020).

123.    If there exist substantial questions whether the action may have a significant effect on the environment, the agency must prepare an EIS.

124.    If an agency decides not to prepare an EIS for a major federal action, it must supply a convincing statement of reasons to justify its conclusion that a project will not have significant impacts on the environment. *Id.* §§ 1508.1(l), 1501.6 (2020).

125.    NMFS failed to produce a convincing statement of reasons demonstrating that Amendment 14 will not have significant impacts on the environment. NMFS has not taken a hard look at the environmental and conservation impacts that will occur to Cook Inlet salmon stocks as a result of closing the EEZ, including the resulting removal of the

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

48

ability of the State of Alaska to utilize the test boat fishery or early harvest returns in the EEZ, important management tools necessary to evaluate in-season run status and timing. The effects of such a closure are unknown, untested, and highly controversial, and raise serious questions as to whether the approval of Amendment 14 will significantly damage the long-term conservation of the fishery. NMFS and the Council rushed Alternative 4 from proposal to approval in less than two months, and never bothered to pause and look at the environmental consequences of that action. Likewise, NMFS failed to take a hard look at the socioeconomic consequences of closing the EEZ portion of the fishery. The state has a demonstrated pattern of commercial fishery disasters in Cook Inlet over the last decade, and Amendment 14 ensures a permanent disaster situation.

126. NMFS's failure to prepare an EIS in the face of substantial questions regarding significant environmental impacts was arbitrary, capricious, and not in accordance with law, in violation of NEPA, 42 U.S.C. § 4332(2)(C), and the APA, 5 U.S.C. § 706(2).

127. Alternatively, Defendants' decision to issue a FONSI without providing a convincing statement of reasons to justify its conclusion that the project's impacts to the fishery and fishing communities will be insignificant was arbitrary, capricious, and not in accordance with law, in violation of NEPA, 42 U.S.C. § 4332(2)(C), and the APA, 5 U.S.C. § 706(2).

128.    NEPA requires an agency to develop and assess appropriate alternatives in any proposal involving unresolved conflicts concerning uses of available resources. 42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1507.2(d), 1501.5(c)(2) (2020).

129.    The EA fails to consider a reasonable range of alternatives.  Alternative 1 (no action) was foreclosed by the Ninth Circuit.  Alternative 2 (delegation to the state) was secretly a sham, as the state would not accept delegation. Alternative 3 (separate federal management) was crafted by the Council in a manner designed to make it look impracticable and result in closure.  These are not real alternatives, conveniently leaving only Alternative 4, the last-minute proposal by the state designed to prevent outsiders (e.g., NMFS) from interfering with the state's desire to manage the fishery.  While there is no set number of alternatives that must be considered, it should be plain that an agency cannot structure its alternatives so there is only one available alternative, especially when as here that one alternative is the product of improper political motivation.  NMFS was required to, at the very least, consider a version of Alternative 3 that was feasible (as suggested by UCIDA and CIFF in public comments).

130.    NMFS's decision to approve Amendment 14 without considering appropriate alternatives and comparing the environmental impacts of those alternatives was arbitrary, capricious, and not in accordance with law and violated NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. §§ 1502.14(a), 1507.2(d), 1501.5(c)(2) (2020), and the APA, 5 U.S.C. §§ 702, 706.

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Declare that the Defendants violated the MSA, APA, and NEPA;

B.      Declare that the Defendants' actions, as set forth above, were arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law;

C.      Declare that Amendment 14 is not consistent with the Ninth Circuit's decision in this matter;

D.      Declare that Defendants acted in bad faith in adopting and approving Amendment 14;

E.      Vacate Amendment 14 and its implementing regulations, and remand with an order instructing the Defendants to develop an FMP for the *entire* Cook Inlet salmon fishery that complies with the requirements of the MSA, APA, and NEPA and the Ninth Circuit's holding;

F.      Vacate the FONSI, and remand with an order instructing, as appropriate, the Defendants to prepare an EA or EIS that complies with NEPA and the APA;

G.      Appoint a special master to supervise the development of an FMP amendment for the entire Cook Inlet salmon fishery, to set deadlines for the development of that FMP, and to impose interim fishery management measures for the Cook Inlet salmon fishery until the FMP amendment is both issued and fully implemented;

*United Cook Inlet Drift Association, et al. v. NMFS, et al*
51
113095205.1 0014655-00002
Case 3:21-cv-00255-TMB   Document 1   Filed 11/17/21   Page 51 of 52

H.      Award Plaintiffs their reasonable attorney fees, costs, expenses, and disbursements, including attorney fees associated with this litigation pursuant to the Equal Access to Justice Act or other law; and

I.      Award Plaintiffs other and further relief as this Court may deem just and equitable.

DATED this 16th day of November, 2021.

STOEL RIVES, LLP

*/s/ Jason T. Morgan*
Ryan P. Steen, AK Bar No. 0912084
Beth S. Ginsberg, *Pro Hac Vice Pending*
Jason T. Morgan, AK Bar No. 1602010
Connor R. Smith, AK Bar No. 1905046

*Attorneys for Plaintiffs United Cook Inlet Drift Association and Cook Inlet Fishermen's Fund*

*United Cook Inlet Drift Association, et al. v. NMFS, et al*

113095205.1 0014655-00002