Michael A. Barcott
James N. Butler, III
HOLMES WEDDLE & BARCOTT, P.C.
3101 Western Avenue, Suite 500
Seattle, Washington 98121
Telephone:(206) 292-8008
Facsimile: (206) 340-0289
Email:    mbarcott@hwb-law.com
          jbutler@hwb-law.com

Attorneys for Alaska Salmon Alliance

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA AT ANCHORAGE

UNITED COOK INLET DRIFT
ASSOCIATION, *et al.*,

            Plaintiffs,

    v.

NATIONAL MARINE FISHERIES
SERVICE, *et al.*,

          Defendants.

Case No.    3:21-cv-00255-JMK
               3:21-cv-00247-JMK

WES HUMBYRD, *et al.*;

          Plaintiffs,

    v.

NATIONAL MARINE FISHERIES
SERVICES, *et al.*,

          Defendants.

## AMICUS BRIEF OF ALASKA SALMON ALLIANCE IN SUPPORT OF UCIDA PLAINTIFFS' CLAIMS

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 1 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA  98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

The Alaska Salmon Alliance ("ASA") provides this amicus curiae brief in support of vacating Amendment 14 to the to the Fishery Management Plan ("FMP") for the Salmon Fisheries in the Exclusive Economic Zone ("EEZ") Off Alaska ("Amendment 14"), and vacating its implementing regulations, as requested by United Cook Inlet Drift Association ("UCIDA") and Cook Inlet Fisherman's Fund (collectively "UCIDA Plaintiffs"). NMFS failed to comply with various rulemaking requirements while promulgating Amendment 14.

## I.  INTEREST OF THE AMICUS CURIAE

Amicus Curiae ASA is an Alaska nonprofit corporation, comprised primarily of Cook Inlet seafood processors, focused on public education, promoting the value of scientifically based salmon management to preserve habitats and create predictable harvests for all salmon users in the Cook Inlet region. ASA's mission is to advocate for the salmon economy, for a thoughtful, process-oriented allocation of Cook Inlet salmon for the benefit of all Alaskans.

## II.  ARGUMENT

**A.  Rulemaking Requirements**

    1.  Magnuson-Stevens Act

One of the primary purposes of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–91 ("MSA") is "to promote domestic commercial and recreational fishing under sound conservation and management principles." § 1801(b)(3). To do so, the MSA establishes a national program for both conservation and management to prevent overfishing, as well as development of underutilized fisheries to ensure citizens the benefit of employment, food, and revenue. § 1801(a)(6)-(7). Under the program, eight

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 2 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA  98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

Regional Fishery Management Councils were established. § 1852. To carry out the goals of the MSA, the Councils must create an FMP for each fishery requiring conservation, and enact implementing regulations. § 1852(h)(1). *See also UCIDA v. NMFS,* 837 F.3d 1055, 1064 (9th Cir. 2016).

To guide the Councils in this endeavor, Congress announced ten National Standards setting forth principles with which each FMP must be consistent. § 1851(a). Congress also specified certain provisions that each FMP must contain. § 1852(a). The Secretary of Commerce must review each plan for compliance with these statutory requirements, and proceed with a public notice and comment for regulations implementing the plan. § 1854(a)(1)(A). The Secretary of Commerce has delegated this responsibility to the NMFS. *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1170 (9th Cir. 2016).

The fishery involved here (the Upper Cook Inlet ("UCI") salmon fishery) is within the purview of the North Pacific Fishery Management Council ("the Council"). *Id.* The Council first enacted an FMP for the salmon fishery in Alaska in 1979 ("Salmon FMP"). *See* Fishery Management Plan for the High Seas Salmon, 44 Fed. Reg. 33,250 (June 8, 1979). *See also UCIDA,* 837 F.3d at 1058. Since then, the Council has made several amendments. At issue herein is Amendment 14 to the Salmon FMP and its implementing regulations, which were approved by NMFS on November 3, 2021. *See* Final Rule, AKR0013822.

2.      Administrative Procedure Act

Actions taken by NMFS under the MSA to implement an FMP are expressly subject to review under Chapter 7 of the Administrative Procedure Act ("APA"). *See* 16 U.S.C. § 1855(f); 5 U.S.C. § 701 *et seq.* Specifically, the court

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 3 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA  98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

may "invalidate a challenged regulation if the regulation is (1) arbitrary and capricious or an abuse of discretion; (2) unconstitutional; (3) in excess of statutory jurisdiction; or (4) was promulgated without observance of procedure required by law." *Trawler Diane Marie, Inc. v. Brown*, 918 F. Supp. 921, 925 (E.D.N.C. 1995) (citing 5 U.S.C. § 706(2)).

An action under the MSA is arbitrary and capricious if NMFS "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quoted in *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 58–59 (D.D.C. 2014)). NMFS must "respond to significant points raised during the public comment period" and "consider significant alternatives to the course it ultimately chooses." *Nat'l Coal. for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 127–28 (D.D.C. 2002) (quoting *Allied Local Regional Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000)). If there is no "rational connection" between the facts and policy, NMFS's action must be invalidated. *Id.* at 129 (citations omitted).

Here, in enacting Amendment 14 and its implementing regulations, NMFS failed to comply with several National Standards, and failed to include several mandatory provisions in the Salmon FMP. The UCIDA Plaintiffs' complaint and opening brief address numerous violations of the rulemaking process affecting

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 4 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

fishermen. ASA herein focuses on how the rulemaking process failed to include requirements affecting processors.

**B.     Amendment 14 Does Not Promote MSA Objectives.**

The MSA requires the Council and NMFS to develop an FMP for the purpose of conserving, yet utilizing, fisheries in the United States. This directive is clear through multiple Congressional edicts. First, Congress set forth the following express purposes of the MSA:

> (3)     to promote domestic commercial and recreational fishing under sound **conservation** and management principles . . . ;
>
> (4)     to provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the **optimum yield** from each fishery;
>
> . . .
>
> (6)     to encourage the development . . . of fisheries which are currently underutilized or not **utilized** . . . [and] to ensure that optimum yield determinations promote such development in a non-wasteful manner[.]

16 U.S.C. § 1801(b) (bold added). Congress similarly enacted the following relevant National Standards, with which regulations must be consistent:

> (1)     Conservation and management measures shall **prevent overfishing** while achieving, on a continuing basis, the **optimum yield** . . . .
>
> (2)     Conservation and management measures shall be based upon the best **scientific information** available.
>
> . . .
>
> (5)     Conservation and management measures shall, where practicable, consider efficiency in the **utilization** of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 5 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

*Id*. § 1851(a) (bold added). These statutory mandates illustrate that the purpose of every FMP must be to optimize the fisheries productivity through the balancing of conservation with utilization. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1102 n. 15 (9th Cir. 2012) ("The National Standards, and the MSA more generally, require NMFS to balance conservation with yield, not favor one at the expense of the other.").

NMFS claims that Amendment 14 serves the purpose of preventing overfishing. *See, e.g.,* Final Rule, at AKR0013823 ("This action [ ] takes the most precautionary approach to minimizing the potential for overfishing[.]"). This claim, however, falls short for two reasons. First, it is clear from the administrative record that one of the primary motivating factors for Amendment 14, if not the motivating factor, was actually administrative convenience. But administrative convenience is not sanctioned goal. Second, even if prevention of overfishing formed some basis for Amendment 14, it was not balanced with utilization and other National Standards.

The first and strongest indicators that overfishing prevention was not the true purpose of Amendment 14 are NMFS' own findings that (1) "[o]verfishing is not occurring for any Cook Inlet salmon stocks, and none are in an overfished status," Final RIR, at AKR0000324, and (2) "[n]o management alternatives under consideration were expected to increase harvests of Cook Inlet salmon stocks," Final Rule, at AKR0013826, AKR0013839. In fact, the Committee formed by the Council to review the matter concluded that underfishing was a risk and

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 6 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

recommended adding an objective to prevent underfishing. *See* Final RIR, at AKR0000081-82.

The reality of underfishing is borne out in existing data. As discussed in detail in UCIDA's letter dated March 28, 2017, and included in NMFS's Regulatory Impact Review, harvest data from 2011-2016 demonstrates that not enough salmon are being caught relative to escapement goals. *See id.* at AKR0000420-24. More recent data for the Kenai River for sockeye salmon through 2021 reveal the same issue continues to occur and is not improving.[1] As shown in this data, the number of fish being caught is nowhere near the escapement goals set by Alaska. *Id.* (7.1 million fish <u>less</u> than desired were caught from 2002-2021).

There are two "very real implications" to underfishing. *See* Final RIR, at AKR0000472 (NOAA report). First, underfishing results in financial loss from foregone harvest. *Id.* at AKR0000422, AKR0000472. Second, due to the complex biological salmon cycle, underfishing one year is likely to lead to decreased salmon returns in future years. *Id.* Neither result aligns with National Standard 1. Despite these verities, NMFS rejected, without explanation, the Committee's recommendation to include an objective to prevent underfishing. *See id.* § 2.7, AKR0000151-55 (discussing why certain recommendations were rejected, but not the underfishing objective). Thus, while NMFS lauded the scientifically based

---

[1] Attached as Exhibit A is a table prepared by ASA based on the industry's best estimates showing Kenai River late-run sockeye salmon escapement numbers for the years 2000 through 2021.

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 7 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

process employed by Alaska to monitor escapement, NMFS turned a blind-eye to the failure to meet escapement goals. *See, e.g., id.* at AKR0000162-64.

Furthermore, even though salmon fishing may still be permitted in State waters, NMFS has no intention of monitoring the salmon stock for overfishing, which affirms that NMFS has no real concern about overfishing. *See id.* at AKR0000049 ("How is overfished/overfishing determined? n/a"). There is simply no rational connection between NMFS's finding that there is no overfishing or risk of overfishing, and the proffered objective of preventing overfishing. This alone is fatal to Amendment 14. *See, e.g., Nat'l Coal. for Marine Conservation*, 231 F. Supp. 2d at 127–28 (An agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"). *See also Motor Vehicle Mfrs.*, 463 U.S. at 43 (Action is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before [it].").

The true basis for NMFS's decision to close the fishery is evident through its abundant reference to administrative convenience, too many to list herein. For example:

- "This action . . . (3) avoids creating new **management uncertainty**, (4) minimizes **regulatory burden** to fishery participants, (5) maximizes **management efficiency** for the Cook Inlet salmon fishery and (6) avoids the introduction of an **additional management** jurisdiction into the already complex and interdependent network of Cook Inlet salmon fishery sectors." Final Rule, at AKR0013823.

- "Closing the EEZ to commercial salmon fishing avoids creating the significant new **management uncertainty** associated with Alternative 3 . . ." *Id.* at AKR0013823-24.

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 8 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

- "[The Alternative 3] **management structure** would not, in and of itself, lessen the conflicts inherent in the difficult task of allocating salmon . . . . Under any of the action alternatives, NMFS would . . . have to account for removals within State waters by all Cook Inlet salmon fishery sectors and the attendant uncertainty when determining the appropriate level of harvest in Federal waters." *Id.* at AKR0013824.

- "To expand Federal management to the Cook Inlet EEZ, the Council **would need to develop status determination criteria** for the salmon stocks in the Cook Inlet area." Final RIR, at AKR0000097.

- "[I]t is consistent with the Council's practice and policy to close the Cook Inlet EEZ to continue to **facilitate State management** of fully utilized salmon fisheries." *Id.* at AKR0000160.

- "The Council's salmon management policy is to f**acilitate State of Alaska salmon management** in accordance with the Magnuson-Stevens Act, Pacific Salmon Treaty, and applicable Federal law." *Id.* at AKR0000105, AKR0000111, AKR0000148.

- "[B]y prohibiting commercial harvest in the Cook Inlet EEZ, the Council and NMFS **avoid creating new management uncertainty** . . ." *Id.* at AKR0000360.

- "Alternative 4 would **enable the State to manage** salmon fisheries . . ." *Id.*

- "Alternatives 2 and 3 would both require **coordination and work** by the BOF alongside the Council." *Id.* at AKR0000349.

- "Alternative 4 would be the most efficient of the action alternatives in terms of **administrative costs and management efficiency**. Alternative 4 would maintain administrative costs at or near existing levels for the State of Alaska and there would be minimal to no additional costs to the Council and NMFS." *Id.* at AKR0000362.

- "[H]aving participants operating under multiple sets of regulations would increase the **enforcement and administrative complexity** of the fishery." *Id.* at AKR0000383.

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 9 of 22

**HOLMES WEDDLE & BARCOTT, PC**
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

1.
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.

- [C]losure minimizes **regulatory burden** . . ." *Id.* at AKR0000363.
- "[C]losure of the Cook Inlet EEZ would create the most **efficient Cook Inlet salmon management** arrangement." *Id.*

(Emphasis added throughout).

To support closure to commercial fishing, NMFS also attempted to describe dual management with the State of Alaska as so administratively complex as to be nearly impossible. *See id.* § 4.8, at AKR0000354-56 (describing coordination requirements for other options). But this contradicts NMFS's acknowledgement that other fisheries are successfully dually managed by Alaska and federal agencies. NMFS noted that "[i]n other instances where a fishery occurs in both state and Federal waters, Federal management of the Federal portion of the fishery is responsive to state management of the portion of the fishery that occurs in state waters." Final Rule, at AKR0013826. Examples include the Pacific cod fisheries in the Gulf of Alaska and Aleutian Islands, which abuts the Amendment 14 area. *Id.* And in an ironically timed opinion piece, the Commissioner of the Alaska Department of Fish and Game touts the State's ability to manage salmon in Southeast Alaska in conjunction with both the United States and Canadian governments,[2] but NMFS contends that dual management in Cook Inlet is nearly impossible. In other words, NMFS knows how to dually manage fisheries, but refused to do so here. NMFS offered no explanation why dual management works in the Pacific cod fisheries, but will not work in Cook Inlet. *See also Motor*

---

[2] *See* Doug Vincent-Lang, *Opinion: Special Interest Hit Piece Unfairly Targets Southeast Fisheries,* Juneau Empire, Jan. 14, 2022, https://www.juneauempire.com/opinion/opinion-special-interest-hit-piece-unfairly-targets-southeast-fisheries (attached as Exhibit B).

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 10 of 22

Holmes Weddle & Barcott, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

*Vehicle Mfrs.* 463 U.S. at 43 (noting that action is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

Undoubtedly, it might take more effort by NMFS to manage the Cook Inlet commercial salmon fishery in coordination with the State of Alaska than it would to close the fishery and not deal with it all. But that is not the pertinent question. The pertinent question is whether NMFS's desire for administrative ease (rather than conservation) drove its decision to close the commercial fishery. The record demonstrates it did.

But administrative ease is not a Congressionally approved objective under the MSA. Under rulemaking jurisprudence, an action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs.*, 463 U.S. at 43. As stated by the Honorable Chief Judge James von der Heydt of this Court,

> The court can certainly understand the motivation of the Secretary in this instance. . . . Clearly it would be more convenient to reserve the floating easement but convenience is not the touchstone of his authority.

*Alaska Pub. Easement Def. Fund v. Andrus*, 435 F. Supp. 664, 680 (D. Alaska 1977). Because administrative ease is not a guiding principle under the MSA, NMFS's actions with respect to Amendment 14 were arbitrary and capricious, and Amendment 14 should be invalidated.

Lastly, even if overfishing prevention were NMFS's true purpose, NMFS failed to balance it with utilization. Assuming overfishing were a legitimate

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 11 of 22

concern, closing the EEZ to commercial salmon fishing without any intent to reevaluate and reopen in the future prioritizes overfishing over all else. This, too, violates the MSA.

**C.    By Failing to Consider Community Impacts, Amendment 14 is Not Consistent with National Standard 8.**

In addition to balancing utilization with conservation, Congress clearly expressed that social and economic impacts on affected communities must be taken into consideration in every FMP and regulatory action under the MSA. While NMFS appears to have considered various data regarding the size and composition of the Cook Inlet salmon fishery, NMFS failed to consider impacts on the processing industry and associated communities.

National Standard 8 requires that:

> Conservation and management measures . . . take into account the importance of fishery resources to **fishing communities** by utilizing **economic and social data** that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8). For example, as noted in NMFS's own Guideline, NMFS should consider whether severe reductions in harvest will decrease employment opportunities of processors and adversely affect their families and communities. 50 C.F.R. § 600.345(c)(1). *See Groundfish Forum v. Ross,* 375 F. Supp. 3d 72, 88 (D.D.C. 2019) (employment should be considered). Other factors to consider include impacts on maintaining communities, *id.* at 88, the size of affected communities, *N. Carolina Fisheries Ass'n, Inc. v. Daley*, 27 F. Supp. 2d 650, 665 (E.D. Va. 1998), and profit margins so that resiliency can be evaluated, *id.*

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 12 of 22

Holmes Weddle & Barcott, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

In adopting Amendment 14, NMFS seems to have reviewed various data sets relating to landing of fish harvests, but did not consider what effect closure of the commercial drift gillnet fishery would have on processors and their associated communities. For example, NMFS did not consider lost profit and its impact on the community. Indeed, NMFS reviewed the number of people employed and total wages earned in Kenai Peninsula shorebased processors active in the UCI salmon gillnet fishery from 2009 to 2018. *See* Final RIR, at AKR0000262. But the data was not broken down by community, nor was it developed out in relationship to the communities' size. This limitation renders the data essentially meaningless because one cannot discern the actual impact on the communities. Clearly, the loss of 10 jobs in a city of 100,000 would not have the same impact as the loss of 10 jobs in a town of 200. *See, e.g., N. Carolina Fisheries Ass'n,* 27 F. Supp. 2d at 662 ("[W]ithout demographic information, the number of vessels impacted by the Secretary's actions is meaningless for determining adverse impacts on communities.").

NMFS also reviewed the estimated wholesale value of landings in the UCI salmon drift gillnet fishery from 2009 to 2018. Final RIR, at AKR0000262. But again, the data is for the entire fishery and was not broken down by community, nor was it provided in relationship to each community's size, so it is essentially meaningless. *N. Carolina Fisheries Ass'n,* 27 F. Supp. 2d at 662.

NMFS reviewed several other similar data sets, each summarizing a specific data point, but none examines how any particular community would be impacted, or how resilient the processor industry would be to the commercial

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 13 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

fishery closure. *See id.* at 665 (discussing importance of resiliency considerations). While it may not be necessary for NMFS to review the impact on *every* possible community affected by Amendment 14, close examination of *some* is necessary. *See id.* at 664 ("Certainly, the Secretary need not consider every fishing community remotely affected by his quota regulations. Yet where an examination is warranted, the Court has no authority to waive the Secretary's obligations under the Act.").

In fact, NMFS ignored public comments alerting NMFS that entire processing businesses were likely to cease operating, that local spending on support services would decrease, that operations in Homer would no longer be practical, that fishing heritage and culture would be compromised, that set net fisherman will also cease to operate if processors go out of business, that the quality of salmon in State waters is lower and will drive the price down, and that fishery participants may no longer be able to afford insurance. *See, e.g.,* Final Rule, at AKR0013830-34 (comments 27, 28, 29, 33, 36, 37). Rather than investigate these issues, NMFS insisted that the generalized data it had already reviewed was more reliable and appropriate than the representations of community members. *Id. See also Oregon Trollers Ass'n v. Gutierrez,* 452 F.3d 1104, 1123 (9th Cir. 2006) (suggesting that missing data, analysis, and explanation could support invalidation of NMFS rulemaking under MSA).

In sum, while NMFS reviewed some data, none of it revealed the community impacts expected to flow from Amendment 14, as reported by members of the public. By failing to consider such data, NMFS violated National

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 14 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

Standard 8 and its rulemaking was therefore arbitrary and capricious. *See Motor Vehicle Mfrs.*, 463 U.S. at 43 (noting that an action is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem.").

**D.     The Conclusions Reached by NMFS Regarding the Community Impact Data it did Review are not Rational.**

In addition to failing to consider pertinent data regarding community impact, NMFS reached irrational conclusions regarding the community impact data it *did* consider. In § 4.5.2.3 of its Regulatory Impact Review, NMFS explained in detail how it determined what percentage of the historical UCI salmon drift gillnet fishery harvest came from state versus federal EEZ waters. *See* Final RIR, at AKR0000236-40. NMFS concluded that approximately 48% of the total UCI salmon drift gillnet fishery catch from 2009 to 2018 came from federal waters. *Id. See also id.* at AKR0000277-81 (applying the 48/52 split to various data points). In other words, NMFS was aware that Amendment 14 would close off an area that has historically provided **nearly half** of the salmon harvest to the UCI drift gillnet fishery.

NMFS also recognized that "a number of factors may potentially make it difficult for vessels to fully offset the loss of access to the EEZ by increasing effort inside State waters." *Id.* at AKR0000327. Obstacles include lower catch rates translating into less revenue, less favorable rip tides, congestion costs such as gear conflicts and entanglement, and increased travel to reach fishing grounds. *Id.* Collectively, NMFS admitted:

> The combination of adverse effects on the profitability of fishing operations resulting from a permanent closure of the EEZ may cause the UCI drift gillnet fleet size to shrink, as some fishermen may

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 15 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

choose not to participate in the fishery or shift their fishing effort to other areas.

*Id*. And even if Alaskan agencies increase drift gillnet fishing opportunities in some areas of State waters,[3] NMFS acknowledged the catch rate for those additional fishing areas would still be lower than the EEZ, and would have the likely result of negative impact on other harvests. *Id*. Switching to State waters would also require current UCI drift gillnet permit holders to sell their permits (which will now have little to no value) and buy permits for State waters.

Because the harvest will likely be decreased, NMFS also acknowledged that the processing sector will face similar obstacles.

Smaller operations would probably be more affected by changes in salmon landings than larger buyers because smaller buyers tend to be less diversified in the range of species handled. In addition, . . . a number of large shorebased processors are heavily dependent on UCI drift gillnet-caught salmon [and] [s]ubstantial decreases in production could lead to a temporary shutdown or permanent closing of some processing businesses.

*Id*. NMFS further acknowledged that processors will likely experience a change in landing patterns and operational flow, which will shift when and where the harvest reaches the market, which will in turn impact local availability and price. *Id*. at AKR0000328.

---

[3] Significantly, there is no indication that Alaska will facilitate additional commercial fishing. To the contrary, Alaskan agencies have been "systematically putting the Cook Inlet commercial fisheries out of business." *See* Elwood Brehmer, *Dunleavy Administration Enters Court Fight Alongside Feds to Keep Cook Inlet Fishing Grounds Closed*, Anchorage Daily News, Jan. 12, 2022, https://www.adn.com /alaska-news/2022/01/11/dunleavy-administration-enters-court-fight-alongside-feds-to-keep-cook-inlet-fishing-grounds-closed/ (attached as Exhibit C). *See also* Final RIR, at AKR0000309 ("The [ADF&G Division of Sport Fisheries]'s mission is to protect and improve the State's <u>recreational</u> fisheries resources.") (Emphasis added).

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 16 of 22

Holmes Weddle & Barcott, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

Despite these grave forecasts, NMFS nonetheless concluded that Amendment 14 "would provide for sufficient salmon harvest opportunity in State waters to largely offset the costs." NMFS also inexplicably concluded that

> [C]losing the Cook Inlet EEZ to commercial salmon fishing would result in additional harvest opportunity in State waters, and that the associated <u>benefits</u> would be distributed across Cook Inlet fishing communities given the diversity of users involved. In all, the Analysis supports a finding that this action will provide for the sustained participation of fishing communities in Cook Inlet salmon fisheries, even if there is some redistribution of benefits.

*Id.* at AKR0000363 (emphasis added). Somehow, NMFS turned the myriad of obstacles into benefits. These conclusions "run counter to the evidence" and were "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs.*, 463 U.S. at 43. Because there is no rational connection between Amendment 14 and the underlying facts, Amendment 14 must be invalidated.

**E.      The Allocation of Fishing Access to the EEZ is not Fair and Equitable to Processors, which Violates National Standard 4.**

NMFS also violated the MSA because Amendment 14 is not consistent with National Standard 4, which requires that any allocation of fishing privileges be "fair and equitable," "reasonably calculated to promote conservation," and carried out in such manner to prevent excessive share to any individual or entity. 16 U.S.C. § 1851(a)(4). Rather than address the issue, NMFS simply claimed that Amendment 14 does "not allocate or assign fishing privileges," which is not accurate. *See* Final RIR, at AKR0000361. *See also* Final Rule, at AKR0013836.

Amendment 14 closes the Cook Inlet EEZ fishery only to commercial salmon fishing. *See* Final RIR, at AKR0000147; Final Rule, at AKR0013823. The

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 17 of 22

Holmes Weddle & Barcott, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

EEZ remains open to other fishing sectors, including recreational and commercial guided sport fishing. *See* Final Rule, at AKR0013839 (Response to Comment 63). By definition, therefore, NMFS has allocated fishing rights between the commercial, recreational, charter, subsistence, and personal use sectors.

Guidelines issued by NMFS are in accord:

> An "allocation" . . . is a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals. . . [F]or example, . . . different quotas or fishing seasons for **recreational and commercial fishermen**, assignment of ocean areas to different gear users, and limitation of permits to a certain number of vessels or fishermen.

50 C.F.R. § 600.325(c)(1). *See also Groundfish Forum*, 375 F. Supp. 3d at 88 (noting that a rule under which vessels could only deliver their catch to one facility constitutes an allocation of resources under National Standard 4).

Because Amendment 14 allocates fishing rights among commercial, recreational, commercial guided sport, subsistence, and personal use fishermen, the FMP must be consistent with National Standard 4. By characterizing its actions as something other than allocation, NMFS avoided such analysis. *See* Final RIR, at AKR0000361-62. But even a cursory review reveals that Amendment 14 woefully violates the first two requirements of National Standard 4.

First, National Standard 4 requires allocation to be "fair and equitable." 16 U.S.C. § 1851(a)(4). Amendment 14 is discriminatory on its face. There is nothing fair and equitable about NMFS's decision that recreational and commercial guided sport fishermen are more deserving of salmon than commercial fisherman (or others) and NMFS offered no explanation for the disparate treatment. *Contra Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 225 (D.D.C. 1990)

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 18 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

(regulation did not violate National Standard 4 where "the provisions challenged by the plaintiffs [were] not facially discriminatory against commercial fishermen" and there was a reasonable basis to the differential treatment). This inequality hits processors particularly hard because recreational and commercial guided sport fishermen do not sell their fish to processors.

Second, the allocation must be reasonably calculated to **promote** conservation. 16 U.S.C. § 1851(a)(4). An allocation that is conservation-neutral or harms conservation is not permitted under National Standard 4. *Groundfish Forum*, 375 F. Supp. 3d at 88. As discussed above, Amendment 14 is motivated primarily by administrative convenience and not conservation. There is no overfishing problem. Because there is no overfishing problem, conservation is not promoted by discriminating against commercial fishermen and processors. *See supra* § II.B.

Because it is not consistent with National Standard 4, Amendment 14 should be invalidated.

**F.      Amendment 14 Fails to Include Mandatory Provisions.**

Lastly, NMFS failed to comply with 16 U.S.C. § 1853(a), which sets forth fifteen provisions that "shall" be included in any FMP prepared by NMFS. The Salmon FMP, as amended by Amendment 14, fails to include five.

1.      <u>Capacity to Process the Optimum Yield</u>

Every FMP shall "assess and specify the capacity and extent" to which processors can process the optimum yield. § 1853(a)(4)(A). In its Regulatory Impact Review, NMFS referred to § 6.3 of the Salmon FMP and notes "no change." Final RIR, at AKR0000092. But § 6.3 of the Salmon FMP (as amended

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 19 of 22

Holmes Weddle & Barcott, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA  98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

by Amendment 14) simply states "domestic processors have been able to process the entire commercial troll harvest of salmon; there is no reason to expect that situation to change." Salmon FMP, at AKR0019511. Amendment 14 did not alter this text and therefore does not address closure of the Cook Inlet EEZ to commercial fishing. There is no discussion of how capacity will be affected by closing an area that supported nearly 50% of the drift gillnet salmon harvest, or whether processing demands can still be met if processors go out of business.

2.  Fishery Impact Statement

Every FMP shall include a fishery impact statement, which shall "assess, specify, and analyze" the likely conservation, economic, and social impacts and mitigation measures on fishing communities affected by the amendment. § 1853(a)(9)(A). While the Salmon FMP does contain a fishery impact statement, it relies on data available in 2010. *See* Salmon FMP, at AKR0019516-37 (Chapter 8). The only portions of the fishery impact statement updated since 2012 relate to bycatch and vessel safety. *See* Amendment Text, at AKR0001918-19 (revisions to Chapter 8). The amended fishery impact statement does not address closure of the Cook Inlet commercial salmon fishery, and does not address community impacts (as discussed in more detail above).[4] *Id.*; *supra* §§ II.C & II.D.

3.  Identifying Overfishing

Every FMP must "specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished." § 1853(a)(10). As it

---

[4] NMFS asserted that the RIR suffices as the fishery impact statement, but the statutory language suggests otherwise. Persons should not have to review an entire administrative record to find something that Congress said should be "included" in "any" FMP. 16 U.S.C. § 1853(a)(9).

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 20 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

relates to the Cook Inlet, the Salmon FMP states only that "other [unidentified] federal FMPs, together with the State's scientifically-based management program in waters adjacent to the West Area, ensure that overfishing of salmon does not occur[.]" Salmon FMP, at AKR0019511. There are no objective or measurable criteria for identifying overfishing.

4. <u>Trends in Landings for Each Sector</u>

Every FMP must "quantify trends in landings of the managed fishery resource by the commercial, recreational, and charter fishing sectors." § 1853(a)(13). The FMP contains only landing data from 1991 to 2010, which is over a decade old.

5. <u>Fair and Equitable Allocation</u>

For every FMP in which harvest reduction is necessary, fishing rights must be allocated "fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery." § 1853(a)(14). As discussed above, NMFS denied there is any allocation and therefore did not include this content. For the reasons stated above, there was an allocation and it should be addressed in the Salmon FMP. *See supra* § II.E.

Because Amendment 14 does not include several requisite provisions for the Salmon FMP, NMFS violated the MSA and Amendment 14 should be invalidated. *See Motor Vehicle Mfrs.*, 463 U.S. at 43 (noting that an action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem"); *Trawler Diane Marie*, 918 F. Supp. at 925 (invalidation appropriate where regulation is "promulgated without observance of procedure required by law.").

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 21 of 22

HOLMES WEDDLE & BARCOTT, PC
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289

### III. **CONCLUSION**

For the above reasons, ASA requests that Amendment 14 be invalidated, and NMFS directed to produce an Amendment to the Salmon FMP, for the entire Cook Inlet salmon fishery, consistent with the MSA and other applicable federal law, within one year.

DATED this 7th day of February, 2022.

HOLMES WEDDLE & BARCOTT, P.C.

_____/s/Michael A. Barcott_____
Michael A. Barcott, ABA # 7705005
James N. Butler, III ABA # 9311066
Attorneys for Alaska Salmon Alliance

I certify that this pleading contains 5,591 words.

### CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury of the laws of the State of Washington that, on the 7th day of February, 2022, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record using the CM/ECF system.

_____/s/ Michael A. Barcott_____
Michael A. Barcott, ABA #7705005

G:\7935\33314\Pleading\ASA Amicus Brief 2-7-22.docx

ALASKA SALMON ALLIANCE AMICUS BRIEF
*UCIDA, et al. v. NMFS, et al.*
Case No. 3:21-cv-00255-JMK
Case No. 3:21-cv-00247-JMK - Page 22 of 22

**HOLMES WEDDLE & BARCOTT, PC**
3101 WESTERN AVENUE, SUITE 500
SEATTLE, WA 98121
TELEPHONE (206) 292-8008
FAX (206) 340-0289