IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED COOK INLET DRIFT
ASSOCIATION, *et al.*,

                Plaintiffs,

    vs.

NATIONAL MARINE FISHERIES
SERVICE, *et al.*,

                Defendants,

STATE OF ALASKA,

                Defendant-
                Intervenor.

WES HUMBYRD, *et al.*;

                Plaintiffs,

    vs.

GINA RAIMONDO, in her official
capacity as Secretary of the U.S.
Department of Commerce, *et al.,*

                Defendants.

Case No. 3:21-cv-00255-JMK
3:21-cv-00247-JMK
CONSOLIDATED


**ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT**

# I. INTRODUCTION

This matter comes before the Court on two consolidated cases challenging the National Marine Fisheries Service's ("NMFS") promulgation of a Final Rule amending a Federal Management Plan ("FMP") pursuant to the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1891(d) ("Magnuson-Stevens Act" or the "Act"). Pending before the Court at Docket 36 is Plaintiffs Wes Humbyrd, Robert Wolfe, and Dan Anderson's (collectively, the "Humbyrd Plaintiffs") Motion for Summary Judgment against Defendants NMFS, Gina Riamondo in her official capacity as the United States Secretary of Commerce (the "Secretary"), and Janet Coit in her official capacity as the Assistant Administrator of National Oceanic and Atmospheric Administration ("NOAA") (collectively, the "Humbyrd Defendants").

Additionally, pending before the Court at Docket 38 is Plaintiffs United Cook Inlet Drift Association and Cook Inlet Fisherman Fund's (collectively, the "UCIDA Plaintiffs") Motion for Summary Judgment against NMFS, NOAA, Gina Riamondo in her official capacity as the Secretary, Janet Coit in her official capacity as the Assistant Administrator of NOAA, and James Balsiger in his official capacity as NMFS Alaska Regional Administrator (collectively, the "UCIDA Defendants" and together with the Humbyrd Defendants, the "Federal Defendants"). The State of Alaska intervened as a

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                        Page 2

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 2 of 54

Defendant. The Alaska Salmon Alliance, City of Kenai, City of Homer, and City of Soldotna filed amicus briefs in support of UCIDA.[1]

Consistent with this Court's Order consolidating review of the two cases now before it, Federal Defendants filed a combined response brief ("Cross Motion for Summary Judgment") at Docket 53 and moved for summary judgment on all claims raised by both sets of Plaintiffs. UCIDA Plaintiffs filed a Reply at Docket 57; Humbyrd Plaintiffs filed a Reply at Docket 58. The Court heard oral argument on April 22, 2022.[2]

For the following reasons, UCIDA Plaintiffs' Motion for Summary Judgment at Docket 38 is **GRANTED**. Humbyrd Plaintiffs' Motion for Summary Judgment at Docket 36 is **DENIED**. Federal Defendants' Cross Motion for Summary Judgment at Docket 53 is **GRANTED IN PART** and **DENIED IN PART**.

## II. BACKGROUND

Salmon fishing bears great cultural, economic, and recreational significance to Alaskans. It is thus no wonder that the regulation of Alaska's fisheries presents unique challenges. The historical regulation of Alaska's salmon fisheries was detailed at great length by the Ninth Circuit in *United Cook Inlet Drift Association v. National Marine Fisheries Service* ("*UCIDA I*");[3] therefore, this Court will only briefly summarize the facts relevant to its decision here.

---

[1] Docket 35-1 (Amicus Brief of Alaska Salmon Alliance in Support of UCIDA Plaintiffs' Claims); Docket 44 (City of Soldotna's Amicus Brief); Docket 45-2 (Amicus Brief of the City of Kenai Supporting UCIDA Plaintiffs' Claims); Docket 46-1 (Brief of Amicus Curiae the City of Homer, Alaska).
[2] Docket 65 (Minute Entry for Oral Argument).
[3] 837 F.3d 1055 (9th Cir. 2016).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                    Page 3

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 3 of 54

This case centers around the Cook Inlet, "one of the nation's most productive salmon fisheries."[4] The Cook Inlet is a large inlet that connects the Pacific Ocean to major Alaskan rivers, and contains both state and federal waters. Inhabiting its waters are anadromous salmon, which begin their lives in Alaskan freshwater, migrate to the ocean, and return to freshwater to spawn.[5] The Cook Inlet salmon fishery contains five species of Pacific salmon: Chinook, Silver, Sockeye, Pink, and Chum.[6] Each species is comprised of a number of "stocks," which generally are delineated by the areas in which the salmon spawn or the time of year that they spawn.[7]

## A. Management of Fisheries Under the Magnuson-Stevens Act.

### 1. Federal management

"In 1976, Congress enacted the Fishery Conservation and Management Act (the "1976 Act"), later renamed the Magnuson-Stevens Act."[8] The Magnuson-Stevens Act established federal management authority over (i) all fishery resources within federal waters, commonly referred to as the "exclusive economic zone" ("EEZ"), and (ii) beyond the EEZ, "over such anadromous species and Continental Shelf fishery resources."[9] The Magnuson-Stevens Act delegates fishery management authority and responsibility to NOAA, an agency within the Department of Commerce, and NOAA, in turn, has delegated

---

[4] *Id.* at 1057.
[5] *Id.*
[6] AKR0000162. The Court follows the Parties' practice of citing to record materials by their production number, which begin with the prefix "AKR" and are found at Dockets 62-1–61-6.
[7] *See* AKR0000170.
[8] *UCIDA I,* 837 F.3d at 1058.
[9] 16 U.S.C. § 1801(b)(1).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 4

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 4 of 54

some of its authority and responsibility to NMFS, an agency within NOAA.[10] The Act extended federal jurisdiction to 200 nautical miles from the shore and established eight regional fishery management Councils, each of which is tasked with developing an FMP for each fishery under its jurisdiction.[11]

"In 1983, Congress amended the Act to specify that a Council need only prepare an FMP with respect to a fishery 'that requires conservation and management.'"[12] The purpose of an FMP is to "achieve and maintain, on a continuing basis, the optimum yield from each fishery" and, to facilitate that endeavor, each FMP must comply with ten National Standards.[13] Voting Council members include federal and state fishery management officials, as well as other fishery experts nominated by state governors and appointed by the Secretary.[14] Amendments to an FMP may be developed through a public process which includes Council meetings, opportunities for interested persons to submit oral and written statements during those meetings, and public hearings.[15] Once a Council recommends an amendment, the Secretary must determine whether it complies with federal law, and, if it does, the Secretary must issue implementing regulations.[16] Relevant to this case, "[t]he North Pacific Council [("the Council")] has jurisdiction over the federal waters of Cook Inlet."[17]

---

[10] AKR0000013–16; AKR0000001–04.
[11] *UCIDA I*, 837 F.3d at 1057–58.
[12] *Id.* at 1058; 16 U.S.C. § 1852(h)(1). The Act additionally was amended in 1996 and reauthorized in 2007. *See UCIDA I*, 837 F.3d at 1062.
[13] 16 U.S.C. § 1801(b)(4); 16 U.S.C. § 1851.
[14] 16 U.S.C. § 1852(b).
[15] *See id.* §§ 1852(h)(3), (i)(2).
[16] *Id.* § 1853.
[17] *UCIDA I*, 837 F.3d at 1060.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                          Page 5

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 5 of 54

## 2. State management

Although NMFS has "exclusive fishery management authority" over all fish within the EEZ, and over all anadromous species throughout their migratory range beyond the EEZ, the Act explicitly recognizes and reserves State jurisdiction over in-state fishery resources.[18] However, a state fishing management program may not "substantially and adversely affect" the implementation of an FMP.[19] NMFS may delegate implementation of an FMP to a state, but only expressly in an FMP, and only when the "[s]tate's laws and regulations are consistent with such [FMP]."[20]

Historically, the Cook Inlet fishery has been managed by the State of Alaska, despite persistent ambiguity with respect to the division of management authority between the State and NMFS due to changing federal regulatory regimes. In its earliest iteration, NMFS promulgated the Fishery Management Plan for the High Seas Salmon ("Salmon FMP") in 1979,[21] which "divided Alaskan federal waters into East and West Areas; Cook Inlet is in the West Area."[22] The Salmon FMP prohibited commercial salmon fishing in the West Area, "except in the three historic net-fishing areas, including Cook Inlet, which the State would continue to manage."[23] The Salmon FMP was revised in 1990 in an attempt to mirror regulations implementing the North Pacific Fisheries Act of 1954 ("1954 Act").[24]

---

[18] 16 U.S.C. §§ 1811(a), (b)(1), 1856(a) ("[n]othing in this chapter shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries.").

[19] *See id.* §§ 1856(a)(1), (b)(1)(B).

[20] *UCIDA I*, 837 F.3d at 1060; 16 U.S.C. § 1856(a)(3)(B).

[21] 44 Fed. Reg. 33250 (June 8, 1979) (to be codified at 50 C.F.R. pt. 674).

[22] *UCIDA I*, 837 F.3d at 1058 (citing 44 Fed. Reg. 33267).

[23] *Id.* (citing 44 Fed. Reg. at 33267).

[24] *Id.* at 1059; *see also* Pub. L. No. 83–579, §§ 10 & 12, 68 Stat. 698, 699–700 (previously codified at 16 U.S.C. §§ 1021–35).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                      Page 6

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 6 of 54

The 1990 revisions prohibited salmon net fishing in the West Area, "with the exception of the three historic net-fishing areas, which technically extend into the EEZ, but . . . are conducted and managed by the State of Alaska as nearshore fisheries."[25] Later, in 1992, Congress repealed the 1954 Act and the Secretary followed suit by repealing its implementing regulations.[26] This effectively rendered the Salmon FMP incomplete, as it failed to specify how the Cook Inlet EEZ would be managed. Nevertheless, the State of Alaska continued to captain management efforts.

Currently, Cook Inlet salmon are managed by the State according to "escapement goals," which are the number of salmon that escape harvest and return to freshwater to spawn.[27] According to historical management data, the commercial harvest of salmon from the Cook Inlet has decreased significantly over the past two decades, despite its reputation as one of the best commercial fishing locations in Alaska.[28]

## B.    The History of this Litigation

### 1.    Amendment 12

In 2010, the North Pacific Council reviewed the Salmon FMP and determined that the Cook Inlet was "not exempt from the FMP as previously assumed."[29] The Council observed that "the FMP does not explicitly defer management of [the three historic net fisheries] to the State . . . [and] does not contain any management goals or

---

[25] *UCIDA I*, 837 F.3d at 1059 (internal quotation omitted).
[26] *Id.* (citing Removal of Regulations, 60 Fed. Reg. 39271, 39272 (Aug. 2, 1995)).
[27] *See* AKR0000163; AKR0000167–68.
[28] AKR0000577–78; *see also* Docket 38 at 14–16.
[29] *UCIDA I*, 837 F.3d at 1060.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 7

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 7 of 54

objectives for these three areas or any provisions with which to manage salmon fishing."[30] To correct this deficiency, the Council proposed Amendment 12 to the Salmon FMP, which removed the three historic net fishing areas and the sport fishery from the FMP's definition of "West Area"; the effect of which was to eliminate federal management of these areas.[31] Amendment 12, as drafted, "maintain[ed] the prohibition on commercial fishing in the redefined West Area."[32]  NMFS solicited public comment on the proposed change and, in April 2012, proposed implementing regulations.[33]  In June 2012, NMFS issued a Final Environmental Assessment ("EA") pursuant to the National Environmental Policy Act ("NEPA"), finding that Amendment 12 would have no significant impact on the environment because it would not change the management of the fisheries.[34]  That Final EA determined that "the State is the appropriate authority for managing Alaska salmon fisheries[,] given the State's infrastructure and expertise."[35]  NMFS promulgated a Final Rule implementing Amendment 12 in December 2012.[36]

2.    *UCIDA I*

        In *UCIDA I,* UCIDA Plaintiffs challenged Amendment 12 and its implementing regulations as "contrary to the Magnuson-Stevens Act's requirement that a

---

[30]  *Id.*
[31]  AKR0013789.
[32]  *Id.*
[33]  *See* 77 Fed. Reg. 19605 (proposed Apr. 2, 2012) (to be codified at 50 C.F.R. pt. 679); 77 Fed. Reg. 21716 (proposed Apr. 11, 2012) (to be codified at 50 C.F.R. pt. 679).
[34]  *UCIDA I,* 837 F.3d at 1061.
[35]  *Id.*
[36]  *See* FISHERIES OF THE EXCLUSIVE ECONOMIC ZONE OFF ALASKA; PACIFIC SALMON, 77 Fed. Reg. 75570 (Dec. 21, 2012) (to be codified at 50 C.F.R. pt. 679); 50 C.F.R. § 679.2 (definition of West Area).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                           Page 8

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 8 of 54

Council prepare an FMP 'for each fishery under its authority that requires conservation and management.'[37] In opposition, the Government agreed that the Cook Inlet "is a fishery under its authority that requires conservation and management,"[38] but argued that the Act only mandated an FMP for fisheries in need of *federal* conservation and management, and the Cook Inlet was properly managed by the State.[39] The District Court found that the Act was ambiguous and deferred to the Government's interpretation of the statute.[40] UCIDA Plaintiffs appealed, and the Ninth Circuit disagreed with the Government's interpretation, finding that "[t]he Act is clear: to delegate authority over a federal fishery to a state, NMFS must do so expressly in an FMP."[41] In other words, simply removing the Cook Inlet from the FMP did not amount to proper delegation of management authority to the State "because a Council is required to develop FMPs for fisheries within its jurisdiction requiring management and then to manage those fisheries 'through' those plans."[42] The Ninth Circuit unquestionably found that NMFS and a regional Council must adopt management measures through an FMP to effectuate delegation of management authority of a fishery to a state; anything less would amount to a failure to comply with the Act. Amendment 12 was found to be arbitrary and capricious and the Ninth Circuit remanded

---

[37] 837 F.3d at 1061 (quoting 16 U.S.C. § 1852(h)(1)). UCIDA also alleged that Amendment 12 and its implementing regulations were arbitrary and capricious and contrary to NEPA. *Id.*

[38] *Id.* at 1062; *see also id.* at 1064 ("No one disputes that the exempted area of Cook Inlet is a salmon fishery.").

[39] *Id.* at 1062.

[40] *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Servs.*, Case No. 3:13-cv-00104-TMB, 2014 WL 10988279, *14 (D. Alaska Sept. 5, 2014).

[41] *UCIDA I*, 837 F.3d at 1062 (citing 16 U.S.C. §§ 1801(b)(4)–(5), 1852(h)(1)).

[42] *Id.* at 1065.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 9

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 9 of 54

the case back to the District Court without vacatur.[43]  The parties agreed to maintain the status quo (management by the State of Alaska) while NMFS and the Council worked to develop a new, compliant amendment.[44]

### 3.    Amendment 14

The Council first met in April 2017 to begin the process of drafting a new amendment, initially identifying three preliminary alternatives to consider:  Alternative 1, a no action alternative; Alternative 2, "[a]mend the Salmon FMP to include three traditional net fishing areas in the FMP's fishery management unit in the West Area and establish cooperative management for these salmon fisheries that delegates specific management measures to the State of Alaska"; and Alternative 3, "[a]mend the Salmon FMP to include three traditional net fishing areas in the FMP's fishery management unit in the West Area and apply Federal management to those portions of the fisheries that occur in the EEZ."[45] In June 2020, the Council replaced Alternative 2 with an expanded version that would establish management requirements for Cook Inlet salmon stocks throughout their range.[46]

Between April 2017 and June 2020, the Council and NMFS continued to review these three alternatives and assembled a Salmon Stakeholder Committee ("the Salmon Committee") to "develop recommendations under Alternative 2."[47]  In September 2019, concerned by the pace of the remand and the scope of the alternatives before the

---

[43] *Id.*
[44] Docket 38 at 19.
[45] AKR0014925.
[46] AKR0017661–64.
[47] *See* AKR0018504.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                    Page 10

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 10 of 54

Council, UCIDA Plaintiffs sought enforcement of the District Court's August 2017 Order and Entry of Judgment, which was jointly agreed to by UCIDA and NMFS and directed NMFS to develop a new plan amendment.[48]  The District Court declined to address the specific alternatives before the Council, but ordered NMFS "to prepare and adopt a salmon FMP compliant with the Ninth Circuit's decision on or before December 31, 2020, and final agency action and/or promulgation of a final rule shall occur within one year thereafter."[49]

In October 2020, representatives from the State of Alaska presented a motion to the Council that described an altogether new fourth alternative for consideration.[50] Alternative 4 would "[a]mend the Salmon FMP to include the Cook Inlet EEZ in the FMP's fishery management unit in the West Area and apply Federal management by extending the general West Area prohibition on commercial salmon fishing in the EEZ to the Cook Inlet EEZ."[51]  Shortly after the introduction of Alternative 4, a representative for the State of Alaska announced for the first time publicly that the State would be unwilling to accept delegated management authority over Cook Inlet.[52]  The State's announcement rendered Alternatives 1 and 2 impracticable, leaving Alternatives 3 and 4 as the only seemingly viable options, and the Council voted unanimously to recommend Alternative 4.[53]

---

[48] AKR0018390.
[49] *See United Cook Inlet Drift Ass'n v. NMFS*, Case No. 3:13-cv-00104-TMB, 2020 WL 1061794, at *5 (D. Alaska Jan. 6, 2020) (emphasis omitted).
[50] AKR0006544–45.
[51] AKR0006545.
[52] AKR0007302.
[53] AKR0007318–19.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 11
Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 11 of 54

However, James Balsiger, NMFS's regional administrator for the State of Alaska, abstained from the vote.[54]

On June 4, 2021, NMFS promulgated a proposed rule implementing Alternative 4, which later became Amendment 14, and a draft EA.[55] Following a public comment period, NMFS issued its Final Rule on November 3, 2021.[56] The Final Rule "amended the Code of Federal Regulations to change the definition of 'The West Area' to include 'the Cook Inlet EEZ Subarea.'"[57] NMFS explained in its Final Rule that Amendment 14 would prohibit commercial salmon fishing in the federal waters of the Cook Inlet.[58] However, "[u]nder the Salmon FMP, recreational fishing c[ould] still occur in the Cook Inlet EEZ."[59] Because "[t]he only commercial salmon fishery that occurs in [the] federal waters of Cook Inlet is the drift gillnet fishery . . . [i]f federal waters were closed to commercial salmon fishing, fishing with drift gillnet gear would occur only in state waters."[60] The practical impact of the Final Rule to fishermen is thus that "drift gillnet vessels displaced by a permanent EEZ closure would have the options of ceasing to fish or relocating their fishing activities to State waters in Upper Cook Inlet."[61]

Humbyrd and UCIDA Plaintiffs brought separate actions against Federal Defendants, both alleging that Amendment 14 and the implementing Final Rule are

---

[54] AKR0007315; AKR0007319.
[55] Docket 53 at 35; AKR0013812–21.
[56] AKR0013822–42.
[57] Docket 53 at 37; *see also* AKR0013822; AKR0013841–42.
[58] *See* AKR0013839.
[59] *Id.*
[60] AKR0007130.
[61] AKR0000327.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 12

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 12 of 54

unlawful, albeit under drastically different legal theories. Humbyrd Plaintiffs allege that Amendment 14 and the Final Rule violate the Magnuson-Stevens Act and Administrative Procedure Act ("APA") because they are contrary to the Federal Constitution's Appointments, Take Care, and Executive Vesting Clauses; while UCIDA Plaintiffs allege the regulation violates the Magnuson-Stevens Act, APA, and NEPA because it is arbitrary and capricious and not in accordance with law.[62] On January 6, 2022, this Court granted Federal Defendants' Motion to Consolidate the cases.[63] On the same day, this Court granted the State of Alaska's Motion to Intervene as a Defendant in the UCIDA matter.[64] Both cases challenge and request vacatur of the same Final Rule; therefore, the law and facts in both are drawn from, and decided on, the same administrative record.[65]

## III. LEGAL STANDARD

The Magnuson-Stevens Act provides for judicial review of final regulations promulgated by NMFS "which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing."[66] "Actions taken by the Secretary under regulations implementing fishery management plans are 'subject to judicial review to the extent authorized by, and in accordance with,' . . . APA."[67]

---

[62] Docket 36 at 2.
[63] Docket 20.
[64] Docket 21. The Court later denied the State of Alaska's Motion to Intervene in the Humbyrd matter as untimely. *See* Docket 66 at 3.
[65] *See generally* Docket 62.
[66] 16 U.S.C. § 1855(f)(2).
[67] *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016) (quoting 16 U.S.C. § 1855(f)(1)); *see also* 16 U.S.C. § 1855(f)(1)(B) ("the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), (D) of [the APA].").

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 13

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 13 of 54

Summary judgment generally is appropriate under Federal Rule of Civil Procedure 56 when the pleadings and evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." However, "in a case involving review of a final agency action under the APA, 5 U.S.C. § 706 . . . the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record."[68]   Under the APA, the agency is tasked with resolving factual issues to render a decision that is supported by the administrative record; therefore, "the function of the district court [in reviewing the agency's decision] is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."[69]   Particularly where

> a party challenges an FMP, plan amendment, or regulation as inconsistent with one or more of the ten National Standards set forth in 16 U.S.C. § 1851(a), a court's "task is not to review de novo whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record."[70]

Pursuant to the APA, regulations may be set aside if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[71] "To determine whether the agency's decision was arbitrary and capricious, the court must

---

[68] *North Carolina Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007).
[69] *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985); *see also Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of th[e] matter does not require fact finding on behalf of this court.  Rather, the court's review is limited to the administrative record . . . .").
[70] *Gutierrez*, 518 F. Supp. 2d at 79 (quoting *C & W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1562 (D.C. Cir. 1991)).
[71] 5 U.S.C. § 706(2)(A).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 14

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 14 of 54

consider whether the decision was based on a consideration of the relevant factors required by the statute, but the court is not empowered to substitute its judgment for that of the agency."[72] Further,

> an agency's decision may "be found to be arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise."[73]

If the Secretary "has considered the relevant factors and articulated a rational connection between the facts found and the choice made," then the decision is not arbitrary or capricious.[74] But if the "agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action."[75] Regulations also may be set aside if they are found to be "contrary to constitutional right, power, privilege, or immunity."[76]

## IV.  DISCUSSION

The Court first addresses UCIDA Plaintiffs' statutory claims that the Final Rule violates the Magnuson-Stevens Act (including the National Standards), APA, and NEPA.  The Court will then address Humbyrd Plaintiffs' claims that Amendment 14 and

---

[72] *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016) (internal citations and quotation omitted).

[73] *Id.* (quoting *Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1066 (9th Cir. 2005) (internal quotation omitted)).

[74] *Id.* (quotation omitted).

[75] *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (citation and quotation omitted).

[76] 5 U.S.C. § 706(2)(B).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 15

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 15 of 54

the Final Rule run afoul of the Appointments, Take Care, and Executive Vesting Clauses of the United States Constitution.  Lastly, the Court addresses remedies.  In addressing the Parties' arguments, this Court has considered the administrative record compiled by NMFS and, consistent with the requirements of the Magnuson-Stevens Act, the Court has adhered to an expedited schedule for disposition of this matter in anticipation of the salmon fishing season beginning on June 20, 2022.[77]

## A.      The Final Rule is Arbitrary and Capricious

UCIDA Plaintiffs argue that NMFS's adoption of Amendment 14 to the Salmon FMP and promulgation of implementing regulations that prohibit commercial salmon fishing in the Cook Inlet EEZ "violates the Magnuson Act, disregards the Ninth Circuit's clear instruction, and arbitrarily and capriciously elevates the State's interest over the goals and purpose of the Magnuson Act."[78]  Specifically, UCIDA Plaintiffs allege that the closure was effectuated for political reasons that do not comply with NMFS's obligations to federally manage the fishery under the Magnuson-Stevens Act, and improperly defers management to the State of Alaska.[79]  UCIDA Plaintiffs also allege that Amendment 14 and the Final Rule are not consistent with National Standards 1, 2, 4, and 8.[80]  Federal Defendants respond that Amendment 14 and the Final Rule are fully compliant

---

[77] *See* Docket 9 at 8; Docket 22 at 3.
[78] Docket 38 at 29.
[79] *Id.* at 31.
[80] *Id.* at 37–46.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                          Page 16

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 16 of 54

with the Magnuson-Stevens Act and the National Standards, the agency's conclusions and findings are not arbitrary and capricious, and the Final Rule should be upheld.[81]

This Court's analysis as to these issues is guided by the Ninth Circuit's decision in *UCIDA I*. In other words, if the agency articulated a reasonable explanation for its decision to promulgate the Final Rule prohibiting commercial fishing in the Cook Inlet fishery, that decision can be reconciled with the Ninth Circuit's interpretation of the Magnuson-Stevens Act in *UCIDA I*, and that decision is supported by the record, the Final Rule must be upheld.[82]

## 1. NMFS's decision to exclude the recreational salmon fishery in the Cook Inlet EEZ Area from the FMP was arbitrary and capricious

At the outset, the Court notes that the Parties disagree on the scope of the "fishery" at issue in this case. The Magnuson-Stevens Act specifically requires that an FMP be developed "for each *fishery* under its authority that requires *conservation and management*."[83] A "fishery" is defined in the Act as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics" and "any fishing for such stocks."[84] "Thus, the usual initial question is whether the fishery at issue even needs conservation and management"; an administrative decision which is reviewed under the familiar arbitrary and capricious standard.[85] In

---

[81] *See generally* Docket 53.
[82] *See Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016).
[83] 16 U.S.C. § 1852(h)(1) (emphasis added).
[84] 16 U.S.C. § 1802(13)(A)–(B).
[85] *UCIDA I*, 837 F.3d 1055, 1061 (9th Cir. 2016).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 17

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 17 of 54

*UCIDA I*, the Ninth Circuit determined that the Cook Inlet is a fishery within NMFS's jurisdiction requiring conservation and management pursuant to the Act.[86]  In so finding, the Ninth Circuit did not distinguish between the commercial and recreational interests included in the EEZ of the Cook Inlet.[87]  Nevertheless, NMFS made this distinction in Amendment 14 and the Final Rule, which regulates only the commercial salmon fishery of the Cook Inlet to the exclusion of the recreational fishery.[88]

Federal Defendants argue that "neither the Council nor NMFS has ever determined that the recreational fishery in the EEZ requires conservation and management and, while NMFS recommended that the Council evaluate that question at some future date, the Council prioritized incorporating the Cook Inlet EEZ commercial salmon fishery into the FMP."[89]  Federal Defendants also argue that the Court should not even reach this issue, asserting that the "the question of whether the recreational salmon fishery in the Cook Inlet EEZ Area must be included in the FMP is separate from the Final Rule at issue here," and, thus, is not an issue properly before this Court.[90]

---

[86] *Id.* at 1062 ("The government concedes that Cook Inlet is a fishery under its authority that requires conservation and management.").

[87] *See generally UCIDA I*, 837 F.3d 1055.  Federal Defendants allege that "the animating premise of UCIDA [Plaintiffs'] arguments is that NMFS was required to regulate commercial salmon fishing in State waters."  Docket 53 at 39.  The Court does not read UCIDA Plaintiffs' briefing as arguing for this result.  Although briefly stating that the fishery at issue in this case should include federal and state waters, UCIDA Plaintiffs appear to agree that, for purposes of this litigation, "the issue here is whether NMFS's decision to close all commercial salmon fishing in *federal* waters to serve the State's political agenda was arbitrary, capricious, and contrary to law."  Docket 57 at 6–7.  The Court does not address NMFS's authority, if any, to manage state waters because it is not pertinent to its decision.  The Court cabins its analysis to the federal waters of the Cook Inlet.

[88] AKR0013822.

[89] Docket 53 at 28.

[90] *Id.* at 45.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                      Page 18

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 18 of 54

NMFS's decision to exclude the recreational sector from the Cook Inlet fishery is before this Court to the extent it is encompassed within the Final Rule. NMFS does not offer a rational explanation for its decision to exclude the recreational fishery from the scope of its definition of the Cook Inlet fishery, nor can the Court determine its decision is supported by the administrative record. In 2018, James Balsiger, Administrator for the Alaska Region of NOAA, actually highlighted this discrepancy in a letter to the Chairman of the North Pacific Fishery Management Council, stating that the Council and NMFS have never "explicitly address[ed] the determination required under *UCIDA v. NMFS*, which is whether the sport fishery for salmon in the West Area EEZ requires conservation and management."[91] In *UCIDA I*, the Ninth Circuit did not specifically distinguish between the "commercial" and "sport" fisheries within the Cook Inlet when it ruled that an FMP must be adopted for the entire fishery. This is because the challenged Amendment 12 explicitly included the sport fishery, eliminating any need for the Court to make such a distinction.[92] Indeed, the EA prepared for Amendment 12 provides detailed information on, and analysis of, the commercial and sport salmon fisheries that occur in the Cook Inlet Area and the status and trends of Cook Inlet salmon.[93] It thus appears that, in the Amendment 12 rulemaking, the Council exercised management authority over the recreational fishery in the Cook Inlet EEZ and the agency has not offered any explanation for its later decision to reverse course.

---

[91] AKR0015107.

[92] FISHERIES OF THE EXCLUSIVE ECONOMIC ZONE OFF ALASKA; PACIFIC SALMON, 77 Fed. Reg. 75570 (Dec. 21, 2012) (to be codified at 50 C.F.R. pt. 679).

[93] AKR0013789.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                    Page 19

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 19 of 54

Further, the Court notes that the decision to exclude the recreational fishery from the Final Rule is difficult to reconcile with the plain language of the 2021 Salmon FMP, which states that "[t]he Cook Inlet salmon fishery includes the stocks of salmon harvested by *all* sectors within State and federal waters of Cook Inlet."[94]  Although the Salmon FMP does distinguish between the commercial fishery and the recreational fishery in the Cook Inlet for purposes of management by closure, in doing so it still appears to acknowledge that both areas require federal conservation and management.  Accordingly, NMFS failed to include a reasoned explanation for its decision to exclude the recreational sector from the FMP for the Cook Inlet salmon fishery.  This by itself renders the Final Rule arbitrary and capricious under the APA.

### 2. The Final Rule delegates management of the Cook Inlet salmon fishery to the State of Alaska in a manner that is inconsistent with the Magnuson-Stevens Act

The Court also finds that NMFS's decision to prohibit commercial salmon fishing in the Cook Inlet EEZ is arbitrary and capricious because it delegates conservation and management measures to the State of Alaska in violation of the Magnuson-Stevens Act and is directly contrary to the Ninth Circuit's ruling in *UCIDA I*.[95]

The functional import of Amendment 14 and the Final Rule is that it "incorporate[s] the Cook Inlet EEZ Area into the FMP's West Area and thereby appl[ies]

---

[94]  AKR0020364 (emphasis added).

[95]  *See UCIDA I*, 837 F.3d 1055, 1065 (9th Cir. 2016) ("The Act allows delegation to a state under an FMP, but does not excuse the obligation to adopt an FMP when a Council opts for state management."). UCIDA Plaintiffs also argue that the closure contained in Amendment 14 "is not a conservation measure." Docket 38 at 30.  The Court declines to address this argument.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                             Page 20

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 20 of 54

the West Area's pre-existing Federal management regime to the Cook Inlet EEZ Area, rather than developing new management measures."[96] UCIDA Plaintiffs argue that the Final Rule allows the State of Alaska to manage the fishery without federal oversight, which constitutes "the same kind of improper delegation [to the State] that was rejected by the Ninth Circuit . . . ."[97] Federal Defendants respond that Amendment 14 and the Final Rule do, in fact, "assert [federal] management authority over the portions of the commercial [salmon] fishery in the Federal EEZ portion of Cook Inlet by incorporating it into the FMP's West Area, as required by the Ninth Circuit's opinion."[98] However, elsewhere in its brief, Federal Defendants declare that NMFS's action "is consistent with the Council's longstanding West Area salmon management policy to facilitate salmon management by the State," and "reflects a determination by the Council and NMFS that the State is best situated to respond to changing conditions in season to fully utilize salmon stocks and avoid overfishing consistent with the constraints of weak stock management in a mixed stock fishery."[99] Although Federal Defendants are correct that "nothing in the Ninth Circuit's opinion required any particular management regime for the Cook Inlet EEZ Area," the Ninth Circuit clearly held that "[t]he Act makes plain that federal fisheries are

---

[96] Docket 53 at 33.
[97] Docket 38 at 32.
[98] Docket 53 at 43. The Court notes that the Ninth Circuit did not expressly task NMFS with including the Cook Inlet salmon fishery in the existing Salmon FMP, despite Federal Defendants' arguments to the contrary.
[99] Id. (quoting AKR0001445).

United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                      Page 21

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 21 of 54

to be governed by federal rules in the national interest, not managed by a state based on parochial concerns."[100]

The record amply supports the conclusion that Amendment 14 and the Final Rule improperly delegates management of the Cook Inlet fishery to the State of Alaska. First, it is apparent from the record that Alternative 4, the precursor to Amendment 14, was adopted only after the State of Alaska protested the express delegation of management authority to it through the Salmon FMP. At the Council meeting in December 2020, representatives from the State of Alaska insisted that the three alternatives under consideration by the Council at that time—and for nearly four years prior—"would open management of an Alaskan salmon fishery to federal and outsider oversight," while Alternative 4 would "ensur[e] against federal incursion into this and other state-managed salmon fisheries."[101] While the State is certainly a stakeholder and should have input into the rulemaking, and federal agencies and State governments must work together to effectuate management of salmon stocks, it appears here that the State had an overriding interest in which alternative was selected.[102] Furthermore, the record clearly establishes that Alternative 4 was crafted as a thinly veiled attempt to ensure an absence of federal management, which conflicts with the Ninth Circuit's holding in *UCIDA I*.[103]

Second, the management standards set by NMFS are federal management standards in form rather than substance. These standards rely entirely on decisions made

---

[100] *UCIDA I*, 837 F.3d 1055, 1063 (9th Cir. 2016).
[101] AKR0000683–85.
[102] *See* 16 U.S.C. § 1801(b)(5), (c)(3).
[103] *See* 837 F.3d at 1063.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 22

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 22 of 54

by the state of Alaska. For example, the Magnuson-Stevens Act requires that each FMP contain "a mechanism for specifying *annual catch limits* in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability."[104] Here, the Final Rule sets the annual catch limit ("ACL") for "the Cook Inlet EEZ Subarea commercial salmon fishery [to] zero."[105] According to NMFS, "[t]his ACL reflects that [Optimum Yield ("OY")] is fully achieved in state waters of Cook Inlet by State salmon fisheries. In order to implement this ACL, NMFS prohibits commercial fishing for salmon in the Cook Inlet EEZ Subarea."[106] Federal Defendants state that the OY for the Cook Inlet salmon fishery is set to "the level of catch from all salmon fisheries occurring within Cook Inlet (State and Federal water catch) . . . ."[107] In other words, the ACL relies on the OY, which is determined by the escapement goals set by the State of Alaska for commercial and recreational salmon fishing in state waters. These escapement goals are not subject to review by the Council or NMFS. In NMFS's own words, its objective is to "[m]anage salmon fisheries in the EEZ in a manner that enables the State to manage salmon stocks seamlessly throughout their range" and "[i]n the West Area, this objective is achieved by prohibiting commercial fishing for salmon in the West Area so that the State can manage Alaska salmon stocks as a unit."[108] This is in direct contravention of the Ninth Circuit's

---

[104] 16 U.S.C. § 1853(a)(15).
[105] AKR0001918.
[106] *Id.*
[107] Docket 53 at 46.
[108] AKR0000106.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                      Page 23

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 23 of 54

finding that "federal fisheries are to be governed by federal rules in the national interest, not managed by a state . . . ."[109]

Moreover, NMFS cannot satisfy its obligation under the Magnuson-Stevens Act to develop a plan for the Cook Inlet salmon fishery simply by applying conservation and management measures (*i.e.*, the closure) from an existing plan. Although not binding on this Court, the Fifth Circuit has found that

> the [Magnuson-Stevens] Act's pertinent conservation provisions apply *to each FMP* and *per fishery*. In other words, the Act requires each management plan to employ conservation techniques for the given fishery, not for all fisheries or the ecosystem as a whole. Accordingly, the Act defines "fishery" as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management."[110]

The Ninth Circuit already has determined that the Cook Inlet salmon fishery is a distinct fishery requiring conservation and management.[111] NMFS therefore was required to independently establish that closure was warranted in the Cook Inlet salmon fishery, rather than blindly importing existing conservation measures from an adjacent area. The text of the amendments to the Salmon FMP offers nothing by way of conservation measures that pertain specifically to the Cook Inlet EEZ. Instead, NMFS simply incorporated the "Cook Inlet EEZ subarea" into the existing management plan and imposed the existing prohibition that applies to other fisheries in the West Area.[112] Permitting this approach would allow

---

[109] *UCIDA I*, 837 F.3d 1055, 1063 (9th Cir. 2016).
[110] *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 468 (5th Cir. 2020) (emphasis in original).
[111] *UCIDA I*, 837 F.3d at 1062.
[112] AKR0013822.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 24
Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 24 of 54

NMFS to tack on any new fishery to any FMP once the Council has decided it requires conservation and management under the Act.

Intervenor-Defendant State of Alaska correctly points out that the Magnuson-Stevens Act contemplates State and Federal cooperation.[113] Indeed, the Magnuson-Stevens Act allows FMPs to "incorporate . . . the relevant fishery conservation and management measures of the coastal States nearest to the fishery."[114] However, pragmatic *incorporation* should not be confused with wholesale *deferral*. The Ninth Circuit determined that the Cook Inlet salmon fishery must be managed "through" the FMP.[115] Inclusion of the "Cook Inlet EEZ Subarea" to an existing list of closure measures, absent further explanation or analysis as to how the closure serves the conservation and management purposes of the Magnuson-Stevens Act *as to the Cook Inlet salmon fishery*, does not amount to management through the FMP. Definitional semantics cannot substitute for actual management, especially where the agency anchors its decision to effectuating delegation to the State without any measures for federal oversight.

The Court holds that NMFS did not offer a reasoned explanation for failing to include the recreational fishery contained within the Cook Inlet salmon fishery in the Final Rule. The Court also finds that NMFS's Final Rule prohibiting commercial salmon fishing in the Cook Inlet salmon fishery is arbitrary and capricious to the extent that it relied entirely on considerations of delegation of management authority to the State of

---

[113] Docket 54 at 11–12.
[114] 16 U.S.C. § 1853(b)(5).
[115] *UCIDA I*, 837 F.3d at 1063.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 25

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 25 of 54

Alaska absent justification consistent with the conservation and management standards contained in the Magnuson-Stevens Act.

## B. Amendment 14 and the Final Rule Do Not Comply with the National Standards

"Any fishery management plan prepared, and any regulation promulgated to implement any such plan," must abide by ten enumerated standards.[116]  The Court notes that "[f]isheries regulation requires highly technical and scientific determinations that are within the agency's expertise, but are beyond the ken of most judges."[117]  For this reason, judicial review of an agency's compliance with the National Standards generally is deferential and the Court will not substitute its judgment for that of the expert agency.[118]  The Court's role is limited to determining whether a reasonable basis exists for the agency's decision.[119]  UCIDA Plaintiffs allege that NMFS failed to comply with National Standards 1, 2, 4, and 8; the Court considers each in turn.

### 1. National Standard 1

National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, *the optimum yield from each fishery* for the United States fishing industry."[120]  "Optimum" in this context is defined as

> the amount of fish which—(A) will provide the greatest overall benefit to the Nation, particularly with respect to food

---

[116] 16 U.S.C. § 1851(a).
[117] *North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 80 (D.D.C. 2007).
[118] *Id.*
[119] *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012) (citing *Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)).
[120] 16 U.S.C. § 1851(a)(1) (emphasis added).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 26

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 26 of 54

> production and recreational opportunities, and taking into
> account the protection of marine ecosystems; (B) is prescribed
> on the basis of maximum sustainable yield from the fishery, as
> reduced by any relevant social, economic, or ecological factor;
> and (C) in the case of an overfished fishery, provides for
> rebuilding to a level consistent with producing the maximum
> sustainable yield in such fishery.[121]

Each FMP must include an estimate of Maximum Sustained Yield ("MSY") which forms

the basis for the OY calculation.[122] "OY is derived from MSY, as reduced by the relevant

economic, social, and ecological factors."[123] UCIDA Plaintiffs argue that Amendment 14

and the Final Rule "fail[] to provide any means to ensure that the Cook Inlet salmon stocks

are not overfished or to ensure that the fishery is achieving optimum yield on a continuing

basis" in violation of National Standard 1.[124]

Amendment 14 and the Final Rule set the MSY for the Cook Inlet salmon

fishery as "the maximum amount of harvest possible under the State of Alaska's

escapement goals."[125] According to the agency, "[o]ptimum yield for the Cook Inlet

salmon fishery is the level of catch from all salmon fisheries occurring within the Cook

Inlet (State and Federal water catch) . . . ."[126] The agency explained that "[t]his OY

recognizes that salmon are fully utilized by State managed fisheries and that the State of

---

[121] 16 U.S.C. § 1802(33).
[122] 50 C.F.R. § 600.310(b)(2)(ii) ("The determination of OY is a decisional mechanism for resolving the Magnuson-Stevens Act's conservation and management objectives, achieving an FMP's objectives, and balancing the various interests that comprise the greatest overall benefits to the Nation. OY is based on MSY. . . .").
[123] AKR0001917.
[124] Docket 38 at 37.
[125] AKR0020364.
[126] Docket 53 at 46.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 27

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 27 of 54

Alaska manages fisheries based on the best available information using the State's escapement goal management system."[127]

As explained *supra* in Section IV.A.2. of this Order, hinging federal management targets on the changing landscape of state decisions is an improper delegation of management authority to the State, and the agency's explanation for its decision to do so fares no better in this context. Federal Defendants assert that the State's management practices for determining MSY and OY can be retroactively supported by an analysis of status determination criteria[128] and reference points that were reviewed by the Council and its Scientific and Statistical Committee ("SSC") in assessing Alternatives 2 and 3.[129] "The analysis found that State management of Cook Inlet salmon stocks had been consistently appropriate for conservation within the bounds of the status determination criteria that would be implemented under Federal management."[130] In ultimately recommending adoption of Alternative 4, in its Proposed Rule, the agency stated that

> [f]ederal management of the Cook Inlet EEZ through closure of the area to commercial salmon fishing (1) takes the most precautionary approach to minimizing the potential for overfishing, (2) avoids creating new management uncertainty, (3) minimizes regulatory burden to fishery participants, (4) maximizes management efficiency for Cook Inlet salmon fisheries, and (5) avoids the introduction of an additional management jurisdiction and the associated uncertainty it would add to the already complex and interdependent network of Cook Inlet salmon fisheries.[131]

---

[127] AKR0000109.
[128] Status determination criteria, as well as an analysis of MSY, OY, and ACLs, allow NMFS to assess whether a stock is overfished or overfishing is occurring. 50 C.F.R. § 600.310(b)(1)(ii).
[129] Docket 53 at 46–47; AKR0013814.
[130] Docket 53 at 36.
[131] AKR0013814.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 28

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 28 of 54

Therefore, when analyzing Alternative 4, the agency effectively recycled the analysis that was performed to assess the viability of Alternatives 2 and 3, concluded that the State of Alaska already was competently managing the salmon stocks in the Cook Inlet EEZ, and on that basis alone, deferred entirely to existing State management measures. "Avoiding management uncertainty," "minimiz[ing] regulatory burden" and "avoid[ing] the introduction of an additional management jurisdiction" are all insufficient justifications for the abdication of federal management authority.[132]  The Ninth Circuit already has determined that this approach does not comply with the Magnuson-Stevens Act's mandate that "federal fisheries are to be governed by *federal rules* in the *national interest*."[133] Bootstrapping statutorily required management measures, such as MSY and OY, to the actual number of fish caught in the Cook Inlet, as determined by the State of Alaska, summarily casts the decision of what constitutes "the amount of fish which . . . will provide the greatest overall benefit to the Nation" to Alaska's Department of Fish and Game.[134] The Magnuson-Stevens Act surely does not intend for the State of Alaska to be the sole arbiter of conservation and management measures without any federal stewardship.

Although the Ninth Circuit in *UCIDA I* determined that NMFS could utilize state management measures, it qualified this finding by stating that NMFS must do so "expressly in an FMP."[135]  Specifically, the Court found that "if NMFS concludes that state

---

[132] *See id.*
[133] *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, 837 F.3d 1055, 1063 (9th Cir. 2016) (emphasis added).
[134] 16 U.S.C. § 1851(a)(1).
[135] *UCIDA I*, 837 F.3d 1055, 1063 (9th Cir. 2016).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 29

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 29 of 54

regulations embody sound principles of conservation and management and are consistent with federal law, it can incorporate them into the FMP."[136]  However, the fishery must be managed "*through those plans*."[137]   Indeed, the Ninth Circuit approvingly points to NMFS's express delegation of salmon fishery management of the East Area to the State of Alaska.[138]  Even assuming the agency appropriately studied and documented the impacts of State management of Cook Inlet salmon stocks, as described above, NMFS's decision to prohibit commercial fishing so that the State can effectuate its management strategy via state waters does not amount to express delegation of that management strategy through an FMP.   The plan for continuous federal management cannot consist of the agency abandoning its responsibilities in favor of deferral to the State.[139]  This approach would open the door for state management that is inconsistent with, and free from, oversight by the federal agencies ultimately tasked with conservation and management of the fishery.

Lastly, NMFS's own analysis determined that "[o]verfishing is not occurring for any Cook Inlet salmon stocks, and none are in an overfished status."[140]  This does not track with the agency's explanation that the reason for the closure is to ensure a "precautionary approach to minimizing the potential for overfishing."[141]   The agency's

---

[136] *Id.* (citing 16 U.S.C. § 1856(b)(5)).
[137] *Id.* (emphasis added).
[138] *Id.* (citing 50 C.F.R. §§ 679.1(i)(2)) ("State of Alaska laws and regulations that are consistent with the Salmon FMP and with the regulations in this part apply to vessels of the United States that are commercial and sport fishing for salmon in the East Area of the Salmon Management Area.").
[139] *See* 16 U.S.C. § 1801(a)(6) (stating that the Magnuson-Stevens Act is intended to establish a "national program for the conservation and management of the fishery resources of the United States. . . .").
[140] AKR0001731.
[141] AKR0013814.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                    Page 30

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 30 of 54

explanation for why closure cannot be reconciled with the evidence before it and its own stated conclusions. A decision to minimize a nonexistent threat is not reasonable.

The administrative record is replete with justifications from NMFS for why the State of Alaska should continue to manage salmon stocks in the Cook Inlet EEZ, but fails to wed State management of the Cook Inlet salmon with proper standards for determining the OY of that fishery. Amendment 14 also does not provide any measures that ensure OY is achieved on a continuing basis. Amendment 14 and the Final Rule therefore do not comply with National Standard 1.

### 2. National Standard 2

National Standard requires 2 that "[c]onservation and management measures shall be based upon the best scientific information available."[142] This standard "dictates that the Secretary cannot simply create a rule out of whole cloth or one based on mere political compromise: a regulation must be based on concrete analysis that permits the Secretary to 'rationally conclude that his [or her] approach would accomplish his [or her] legitimate objectives.'"[143] UCIDA Plaintiffs argue that the prohibition of commercial salmon fishing in the Cook Inlet fishery was based on political compromise rather than science.[144] Federal Defendants respond that "NMFS had no ability or authority to force a

---

[142] 16 U.S.C. § 1851(a)(2).
[143] *The Fishing Co. of Alaska v. United States*, 195 F. Supp. 2d 1239, 1248 (W.D. Wash. 2002) (citing *Parravano, v. Babbitt*, 837 F. Supp. 1034, 1041 (N.D. Cal. 1993)).
[144] Docket 38 at 40–41.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 31

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 31 of 54

delegation on the State . . . and Alaska's reasons are immaterial to NMFS's compliance with National Standard 2."[145]

   This Court recognizes that it is out of its depth in terms of analyzing scientific determinations made during the rulemaking process. That is the job of the expert agency and the purpose of assembling a Council of fishery experts and stakeholders under the Magnuson-Stevens Act. The Court reiterates that its role simply is to determine whether the administrative record before it supports the challenged agency decision.[146] However, if "a plain reading of the proposed NMFS rule, and the undisputed history leading up to the . . . decision, demonstrate that the rule was a product of pure political compromise, not reasoned scientific endeavor[,]" the Court is well-positioned to determine that Federal Defendants failed to meet National Standard 2.[147]

   The Council first met in April 2017 to work on an amendment to the Salmon FMP that complied with the Ninth Circuit's ruling. and initially proposed three alternatives for action.[148] It appears from the administrative record that, although different variations providing for Federal management of the Cook Inlet EEZ were considered, Alternative 2 was the preferred alternative and focused on by the Salmon Committee for nearly four years.[149] To reiterate, Alternative 2 endeavored to amend the FMP to include the Cook

---

[145] Docket 53 at 57–58.
[146] *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012). UCIDA Plaintiffs argue that the State of Alaska has historically mismanaged salmon stocks in the Cook Inlet and at least a part of the impetus for its litigation appears to stem from its unhappiness with declining commercial harvests. Docket 38 at 14–17. The Court declines to address these concerns because they are beyond the scope of its review.
[147] *Midwater Trawlers Co-op. v. Dep't of Commerce*, 282 F.3d 710, 720 (9th Cir. 2002).
[148] Docket 53 at 28.
[149] *See id.* at 29–33; AKR0018504; AKR0000708.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment             Page 32
Case 3:21-cv-00255-JMK  Document 67  Filed 06/21/22  Page 32 of 54

Inlet EEZ Area and delegate authority over specific management measures to the State with review and oversight by the Council. However, in October 2020, a mere two months before the District Court's deadline for the Council to make a final recommendation to NMFS, the State of Alaska introduced Alternative 4.[150]

The administrative record shows that the State of Alaska preferred Alternative 4 for primarily, or perhaps purely, ideological reasons and effectively steered the Council to recommend Alternative 4 over others, despite a lack of public support and analysis. Emails between State Fish and Game officials show that the State's primary motivation for supporting Alternative 4 was resistance to "federal and outsider influence on our state salmon fisheries."[151] The Commissioner of the Alaska Department of Fish and Game drafted an op-ed entitled "State Right to Manage," rejecting "state management in federal waters in line with federal standards."[152] The State of Alaska formally announced its position that it would reject delegated management authority under Alternative 2 at a Council meeting in December 2020.[153] Federal Defendants assert that "without an agreement from the State to accept the delegation of management authority, Alternative 2 was no longer a viable option."[154] The Council then was left with a choice between Alternative 1, the no action alternative, which was not feasible due to the Ninth

---

[150] AKR0019263. *See also* AKR0006543.
[151] AKR0000692.
[152] AKR0000684–85. The draft op-ed declares that the State government "would prefer to close federal waters in Cook Inlet to commercial salmon fishing rather than allowing federal encroachment into the management of Alaska's salmon fisheries." AKR0000685.
[153] AKR0007301–02.
[154] Docket 53 at 34–35.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 33

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 33 of 54

Circuit's ruling; Alternative 3, complete federal management; and Alternative 4. The Council voted unanimously to recommend Alternative 4; however, NMFS's representative to the Council abstained, stating that the State's decision to refuse delegation of management authority left "us only a solution that's been rejected by all of the impacted users."[155]

Even setting aside any political interference in the Council process, the scientific information NMFS had before it in promulgating the Final Rule is inadequate. The SSC offered no analysis on Alternative 4 because it was proposed after the Salmon Committee's analysis already was completed.[156] The Council's Advisory Panel ("AP")[157] did analyze the full panoply of alternatives and found that Alternative 4 "does not consider the migration of displaced fishers and how the amplified effort in State waters will affect harvest strategies," and "has had little to no transparent public process."[158] The AP additionally found that

> [t]he following statement "prohibiting commercial harvest
> enables the state to manage salmon fisheries to achieve
> escapement goals and maximize economic and social benefits
> from the fishery" is not thoroughly explained and reads more
> like an arbitrary statement than best available science.[159]

---

[155] *Id.* at 35.
[156] Docket 57 at 19.
[157] *See* 16 U.S.C. § 1852(g)(3)(A) ("Each Council shall establish and maintain a fishing industry advisory committee which shall provide information and recommendations on, and assist in the development of, fishery management plans and amendments to such plans.").
[158] AKR0016427.
[159] *Id.*

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 34

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 34 of 54

The Court agrees with the AP's findings. The agency does not clearly explain the rationale behind its finding that OY will be maximized through a closure. Conclusory statements cannot substitute for the reasoned explanation that the APA demands.[160] The Court finds that the administrative record does not support a finding that the Final Rule was predicated on the best available scientific information.

### 3. National Standard 4

National Standard 4 requires that:

> [c]onservation and management measures shall not discriminate between residents of different States.[161] If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.[162]

An "allocation" is a "direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals."[163] A closure can be considered an allocation of fishing privileges where

---

[160] *Envt'l Health Trust v. Fed. Commc'ns Comm'n*, 9 F.4th 893, 905 (D.C. Cir. 2021).

[161] Intervenor-Defendant State of Alaska argues that National Standard 4 is irrelevant in evaluating whether Amendment 14 complies with the Magnuson-Stevens Act because it does not discriminate between residents of different states. Docket 54 at 31–32. The State of Alaska does not identify any case law that supports its assertion that National Standard 4's allocation provisions are only applied if the condition precedent of out-of-state discrimination is first established. *See id.* The District of D.C. has found agency action not in compliance with National Standard 4 where an amendment to an FMP placed the commercial sector at a permanent disadvantage and failed to consider the effects of a quota program in evaluating the impacts of reallocation. *See Guindon v. Pritzker*, 240 F. Supp. 3d 181, 195 (D.D.C. Cir. 2017). Further, other courts have assessed the fairness of fishing privilege allocations between different groups of fishermen that were not necessarily based on an in-state/out-of-state distinction. *See, e.g., All. Against IFQs v. Brown*, 84 F.3d 343, 348–50 (9th Cir. 1996) (determining whether an allocation that distinguished between boat owners and boat lessees was fair and equitable under National Standard 4).

[162] 16 U.S.C. § 1851(a)(4).

[163] 50 C.F.R. § 600.325(c)(1).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 35

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 35 of 54

it results 'in direct distributions of fishing privileges . . . . Allocations of fishing privileges include, for example, per-vessel catch limits, quotas by vessel class and gear type, different quotas or fishing seasons for recreational and commercial fishermen, assignment of ocean areas to different gear users, and limitation of permits to a certain number of vessels or fishermen.'[164]

However, a regulation that results in "incidental allocative effects," is not an allocation.[165] "[A]llocations are 'fair and equitable' if they are 'rationally connected to the achievement of optimum yield or with the furtherance of a legitimate FMP objective.'"[166] National Standard 4 provides that "[a]n allocation scheme may promote conservation by encouraging a rational, more easily managed use of the resource."[167]

UCIDA Plaintiffs argue that the Final Rule violates this standard because it "unfairly eliminates all fishing privileges for commercial permit holders in the federal waters in the EEZ . . . while leaving open this same area to be used solely by recreational fishermen."[168] Federal Defendants assert that while the Final Rule has "*incidental allocative effects*," it is not a direct distribution and therefore not an allocation.[169] Federal Defendants further argue that, even if the Final Rule could be construed as an allocation of fishing privileges, it is nonetheless fair and equitable because it applies to all commercial

---

[164] *Nat'l Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 131 (D.D.C. 2002) (quoting 50 C.F.R. § 600.325(c)(1)).
[165] *Id.*
[166] *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 890 (9th Cir. 2010).
[167] 50 C.F.R. § 600.325(c)(3)(ii).
[168] Docket 38 at 42.
[169] Docket 53 at 59 (emphasis in original).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 36

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 36 of 54

fisherman equally and is "rationally connected to achieving optimum yield and maximizing benefits."[170]

The first question for the Court under this standard is whether the closure of the Cook Inlet EEZ to commercial salmon fishing amounts to an allocation. NMFS agrees that, under the Final Rule, recreational salmon fishing is permitted in the Cook Inlet EEZ, while commercial salmon fishing is prohibited.[171] NMFS staff described the impacts of the closure as a "reallocation from the drift gillnet to other fisheries," because "the State could . . . work with sport fishers to increase sport harvest in the EEZ."[172] The closure of the Cook Inlet EEZ to all commercial salmon fishing activities, while simultaneously allowing all recreational fishing activities, clearly fits within the range of actions contemplated by NMFS's regulations as a "different quota[] . . . for recreational and commercial fishermen," as well as an "assignment of ocean areas to different gear users."[173] The Court finds that the Final Rule makes an allocation of fishing privileges.

The second question is whether this allocation is fair and equitable, reasonably calculated to promote conservation, and carried out in such a manner that no particular entity acquires an excessive share of privileges.[174] As to fairness and equity, this Court notes that many other "courts have declined to second-guess the Secretary's judgment simply because the provisions of a FMP or a plan allocation 'have a greater

---

[170] *Id.* at 60.
[171] *See id.* at 56 ("Recreational salmon fishing is still permitted in all of the West Area . . . .").
[172] AKR0007281.
[173] 50 C.F.R. § 600.325(c)(1).
[174] 16 U.S.C. § 1851(a)(4).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                    Page 37

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 37 of 54

impact upon' one group or type of fishermen."[175]  Indeed, the Ninth Circuit has determined that the "Secretary is allowed . . . to sacrifice the interests of some groups of fishermen, for the benefit as the Secretary sees it of the fishery as a whole."[176]  This is because "[i]nherent in an allocation is the advantaging of one group to the detriment of another."[177]  The Magnuson-Stevens Act clearly accounts for "winners" and "losers" in any distribution of privileges, but those losing out on valuable fishing opportunities must do so for the benefit of a larger conservation purpose.

Here, it appears that NMFS effectuated the prohibition on commercial salmon fishing in the Cook Inlet solely to facilitate state management of salmon stocks in the Cook Inlet EEZ, rather than to promote conservation goals.  As discussed *supra* in section IV.A.2. of this Order, this deferral of management responsibility was not rationally related to conservation, but in furtherance of the State of Alaska's goal to remain the sole regulator of salmon stocks in the Cook Inlet.  Federal Defendants have failed to describe which "benefits" this reallocation of fishing privileges for commercial fishers from federal waters to state waters would "maximize," and it is not clear from the record how the closure is supported by any conservation rationale.  Indeed, NMFS determines that the Cook Inlet EEZ is not at risk of being overfished or in overfished status.[178]  As stated above, this does

---

[175] *North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 89–90 (D.D.C. 2007) (quoting *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 225 (D.D.C. 1990)).
[176] *All. Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996).
[177] 50 C.F.R. § 600.325(c)(3)(i)(A).
[178] AKR0001731.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                                    Page 38

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 38 of 54

not comport with Federal Defendant's assertion that the Final Rule is "reasonably calculated to promote conservation by reducing the risk of overfishing . . . ."[179]

Further, the effect of the Final Rule is that recreational fishermen are allocated the entirety of salmon fishing privileges in the Cook Inlet fishery due to the blanket prohibition on commercial salmon fishing. NMFS asserts that this rulemaking applied only to commercial fishing and an explanation as to why recreational fisherman have carte blanche to fish for salmon stocks covered by the FMP is noticeably absent from the administrative record. An assessment of those privileges as compared to the prohibition applied to commercial fisherman also was not considered. Without a reasonable justification rationally related to conservation, and where recreational fishermen receive an excessive allocation of fishing privileges for no stated purpose, this allocation plainly is inequitable.

### 4. National Standard 8

Lastly, National Standard 8 requires that:

[c]onservation and management measures shall, consistent with the conservation requirements of this chapter (including the preventing of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of [National Standard 2], in order to (A) provide for sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.[180]

---

[179] Docket 53 at 60.
[180] 16 U.S.C. § 1851(a)(8).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 39

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 39 of 54

UCIDA Plaintiffs argue that "NMFS and the Council failed to meaningfully assess the actual impact of the closure on fishing communities" and "failed entirely to identify and discuss possible mitigation measures and minimize adverse impacts on fishing communities."[181]  Federal Defendants assert that "NMFS developed quantitative indicators of community fishery engagement and dependency," which included an analysis of "where harvesting vessels and permit holders were located, how dependent these entities were on the drift net gill net fishery, and how dependent they were on salmon caught in the EEZ portion of the fishery."[182]  Federal Defendants assert that, despite extensive analysis, "NMFS could not predict exactly how the fishery would shift due to the Final Rule and therefore could not predict the precise impacts to these communities, but NMFS acknowledged that a loss of revenue could negatively affect fishing communities on the Kenai Peninsula."[183]

At its core, National Standard 8 "requires only that conservation and management measures '*take into account* the importance of fishery resources to fishing communities by utilizing the best available economic and social data" and does not "require any particular outcome with respect to allocations."[184]  It does appear here that the agency performed an extensive analysis of the negative impacts of prohibiting commercial salmon fishing in the Cook Inlet EEZ on commercial fishermen.  In its Final EA, the agency

---

[181]  Docket 38 at 44–45 (internal citations omitted).
[182]  Docket 53 at 50 (citing AKR0000272).
[183]  *Id.* at 61.
[184]  *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1093 (9th Cir. 2012) (emphasis in the original) (quoting 16 U.S.C. § 1851(a)(8) and *Fisherman's Finest, Inc. v. Locke*, 593 F.3d 886, 896 (9th Cir. 2010)).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                    Page 40

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 40 of 54

considered, at length, significant reductions in the number of salmon harvested by the drift gillnet fleet and substantial decreases in production, which could result in the shutdown of processing businesses.[185]  This analysis used economic and social data from the ten most recent years for which data was available to the agency at the time.[186]  Further, in the Final Rule itself, it appears that NMFS responded to several comments expressing concern about the economic impacts the closure would have on communities in the Kenai Peninsula.[187]  Although the impacts described by the agency are less than crystal clear, the Court recognizes that "some degree of speculation and uncertainty is inherent in agency decisionmaking."[188]  Here, the Court can find that the administrative record supports the conclusion that the agency considered the impacts to fishermen in the relevant impacted communities.[189]

It is less clear that the agency considered mitigation measures which would minimize the impacts to these communities, as required by subsection (b) of National Standard 8.[190]  The only evidence of such consideration that Federal Defendants can point to in the record is a few lines in the proposed rule where the agency briefly considered that Alternative 3 might have additional economic impacts and result in regulatory uncertainty.[191]  Federal Defendants argue that once the State of Alaska declared that "it

---

[185]  *See* AKR0000272–329; AKR0007133.
[186]  *See* AKR0000167–68; AKR0000181; AKR0000183; AKR0000184.
[187]  AKR0013831–34.
[188]  *North Carolina Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 85 (D.D.C. 2005) (quoting *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 219 (D.D.C. 2005)).
[189]  *See Fishermen's Finest,* 593 F.3d at 896.
[190]  *See* 16 U.S.C. § 1851(a)(8)(b).
[191]  *See* AKR0013831–32.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                      Page 41

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 41 of 54

would not accept a delegation of authority to manage the EEZ portions of the fishery—there was no option available that would both meet the terms of the Judgment and avoid any changes to the fishery that could affect fishing communities."[192]  But NMFS could have considered any plan short of a complete prohibition of commercial fishing in the Cook Inlet EEZ.  Although an agency certainly is not required to consider *every* possible measure that might mitigate the economic impacts of an action, and National Standard 8 does not guarantee any specific group particular access to a fishery, the plain language of the standard indicates that the agency must engage in *some* analysis of potential mitigation measures.[193]  What little analysis that can be found in the record fails to convince the Court that the Final Rule complies with the subsection (b) of National Standard 8.

The Court holds that the closure contained in the Final Rule is arbitrary and capricious and not in accordance with law.

## C.     UCIDA Plaintiffs Have Failed to Establish that the Final Rule Violated NEPA

UCIDA Plaintiffs additionally allege that Federal Defendants failed to comply with NEPA in promulgating the Final Rule.[194]  "NEPA imposes procedural requirements designed to force agencies to take a hard look at environmental

---

[192] Docket 53 at 62.

[193] *See Groundfish Forum v. Ross*, 375 F. Supp. 3d 72, 86–90 (D.D.C. 2019) (finding that National Standard 8 "does not constitute a basis for allocating resources to a specific fishing community nor for providing preferential treatment based on residence in a fishing community," but also that "where two alternatives achieve similar conservation goals, the alternative the provides the greater potential for sustained participation of fishing communities and minimizes the adverse economic impacts on such communities should be the preferred alternative.") (internal citations omitted)).

[194] Docket 38 at 46–48.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                    Page 42

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 42 of 54

consequences" of their proposed actions.[195] Agencies must prepare an environmental impact statement ("EIS") for federal actions that will "significantly affect[] the quality of the human environment."[196] To determine whether a proposed action will have a significant effect on the quality of the human environment, agencies must prepare an EA.[197] The EA must consider a reasonable range of alternatives, and include a reasonably thorough discussion of the direct, indirect, and cumulative impacts of the proposed alternative.[198] If an agency declines to produce an EIS, it must provide "a convincing statement of reasons to explain why a project's impacts are insignificant."[199] The agency may then "issue a Finding of No Significant Impact and may then proceed with the action."[200]

Like the Magnuson-Stevens Act, "[j]udicial review of agency compliance with NEPA is under the Administrative Procedure Act . . . . "[201] Accordingly, just as the Court required Federal Defendants to adequately explain the basis for the promulgation of the Final Rule and show that the administrative record supports the agency's decision-making, UCIDA Plaintiffs must fully describe the basis for their claims that the agency action here violated NEPA's requirements. UCIDA Plaintiffs do not acknowledge this

---

[195] *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 763 (9th Cir. 2014) (quotations and citation omitted).
[196] 42 U.S.C. § 4332(2)(C).
[197] 40 C.F.R. § 1501.5(a)(1).
[198] *See id.* § 1501.5(c)(2).
[199] *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015) (quotations and citation omitted).
[200] *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004).
[201] *Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*, 399 F. Supp. 3d 888, 900–01 (D. Alaska 2019) (citing *Klamath-Siskiyou Wildlands Center*, 387 F.3d at 993) *aff'd*, 825 F. App'x 425 (9th Cir. 2020); *see also Pac. Coast Fed'n of Fisherman's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 43

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 43 of 54

burden under NEPA, much less carry it. UCIDA Plaintiffs' argument in their opening brief that the Final Rule does not comply with NEPA spans two paragraphs of argument and includes only two citations to the record.[202] UCIDA Plaintiffs allege that NMFS failed to "provide a 'convincing statement of reasons' as to why its unprecedented closure will not have significant impacts" and failed to "consider a reasonable range of alternatives" but does not substantiate those allegations with factual findings from the record, or relevant legal authority.[203] Federal Defendants correctly point out that UCIDA Plaintiffs' arguments are not substantiated enough to establish a NEPA claim. With so little material to analyze this claim, this Court declines to "manufacture arguments" for UCIDA Plaintiffs, "particularly where, as here, a host of other issues are presented for review."[204] UCIDA Plaintiffs therefore have failed to establish a violation of NEPA.

## D. Humbyrd Plaintiffs Lack Standing for Their Constitutional Claims

The Court now addresses Humbyrd Plaintiffs' constitutional challenges to the member composition of the Council. Humbyrd Plaintiffs assert that the Final Rule must be vacated because "the North Pacific Council's members are officers, yet do not comply with constitutional appointment and removal requirements," and therefore, "their

---

[202] Docket 38 at 46–48. While the length of an argument certainly has no bearing on the quality, this Court finds UCIDA Plaintiffs' minimal citation to the record and legal citation particularly problematic where the length of the Final EA produced by NMFS contains nearly 500 pages of analysis. *See* AKR0000040–504.
[203] Docket 38 at 47–48.
[204] *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 44

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 44 of 54

adoption of Amendment 14 was invalid."[205]  As a threshold matter, the Court first must determine whether Humbyrd Plaintiffs have standing to bring these constitutional claims.

Article III of the United States Constitution confines the jurisdiction of the federal courts to actual "cases" and "controversies."[206]  The doctrines of standing, mootness, ripeness, and political question, among others, all elucidate the constitutional limits placed on the role of the courts.[207]  "The [Article] III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important of these doctrines."[208]  Standing asks "whether the plaintiff has shown an injury to himself [or herself] that is likely to be redressed by a favorable decision;"[209] in other words, "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[210]

The "irreducible constitutional minimum of standing contains three elements":  (1) injury-in-fact; (2) traceability or causation; and (3) redressability.[211]  Humbyrd Plaintiffs did not address standing in their opening brief, but argued in their Reply that they are injured by the Final Rule, "which was unlawfully adopted due to the Council members' control over the rulemaking process, and their injuries would be

---

[205] Docket 37 at 13.
[206] U.S. Const. Art. III. § 2.
[207] *See Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975).
[208] *Allen v. Wright*, 468 U.S. 737, 750 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).
[209] *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1513 (9th Cir. 1992) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).
[210] *Allen*, 468 U.S. at 750–51 (quoting *Warth*, 422 U.S. at 498).
[211] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                    Page 45

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 45 of 54

redressed by the Rule's vacatur."[212] Federal Defendants assert that Humbyrd Plaintiffs do not have standing because their "alleged injuries are not caused by the allegedly unconstitutional makeup of the Council," and therefore they cannot demonstrate traceability or redressability.[213] The Court finds that the Humbyrd Plaintiffs have not demonstrated, at least, the final two elements necessary to establish standing and therefore declines to reach the merits of their claims.

### 1. Injury-in-fact

The Court first must determine whether Humbyrd Plaintiffs have alleged an injury-in-fact. Humbyrd Plaintiffs do not address standing at all in their opening brief and instead state that the Court should find standing to be "self-evident" because "the plaintiff is directly regulated by the challenged action."[214] Ironically, Humbyrd Plaintiffs cite to *Sierra Club v. EPA* for this proposition,[215] in which the D.C. Circuit admonished plaintiff's failure to fully establish standing in its opening brief, instead waiting until its Reply to fully develop its arguments.[216] The D.C. Circuit found that "[r]equiring the petitioner to establish its standing at the outset of its case is the most fair and orderly process by which to determine whether the petitioner has standing to invoke the jurisdiction of the court."[217] This Court agrees.

---

[212] Docket 58 at 7.
[213] Docket 53 at 70.
[214] Docket 37 at 13 n.2.
[215] 292 F.3d 895, 899–900 (D.C. Cir. 2002).
[216] *Id.* at 900. The D.C. Circuit cited to *Grant v. United States Air Force*, 197 F.3d 539, 543 n.6 (D.C. Cir. 1999) for the proposition that "our caselaw makes clear that an argument first made in the reply comes too late."
[217] *Sierra Club*, 292 F.3d at 901.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment Page 46

Here, Humbyrd Plaintiffs' standing is far from self-evident.  To establish an injury in-fact, a plaintiff must show that the injury is "concrete and particularized and . . . actual or imminent, not conjectural or hypothetical . . . ."[218]  Humbyrd Plaintiffs appear to challenge the constitutionality of the North Pacific Council and that Council's ability to adopt amendments to an FMP, which then later may be promulgated as regulations by NMFS pursuant to the Magnuson-Stevens Act.[219]  Humbyrd Plaintiffs' arguments do not directly attack the substance of Amendment 14 or the Final Rule, or the process that the *agency* undertook in promulgating the Final Rule.  Nonetheless, the Court need not determine whether Humbyrd Plaintiffs correctly identified an injury-in-fact because it finds that causation and redressability are fatal to its standing.

### 2.  Causation

Humbyrd Plaintiffs are commercial fishermen with nearly 100 years of collective commercial fishing experience in the Cook Inlet.[220]  Understandably, these Plaintiffs are concerned about the Cook Inlet salmon fishery's operations and will be directly impacted by its closure.  Humbyrd Plaintiffs allege that closure of the Cook Inlet EEZ to commercial salmon fishing will have devastating effects on their livelihoods as they will be forced to fish in nearshore state waters.[221]  Humbyrd Plaintiffs assert that the

---

[218] *Jensen v. Locke*, Case No. 3:08-cv-00286-TMB, 2009 WL 10674336, *5 (D. Alaska Nov. 9, 2009).

[219] Docket 36 at 2.

[220] *See* Docket 37-1 at 2; Docket 37-2 at 2; Docket 37-3 at 2.

[221] *See* Docket 37-1 at 2; Docket 37-2 at 2; Docket 37-3 at 2.

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                          Page 47

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 47 of 54

closure will increase operating costs, impose additional travel time, and decrease fishing opportunities, all while significantly reducing their harvest of salmon.[222]

The prohibition on commercial salmon fishing in the Cook Inlet EEZ undoubtedly has direct impacts on the lives of these fishermen, as well as many others. However, the economic injuries described by Humbyrd Plaintiffs are caused by the Final Rule, promulgated by NMFS, not by the Council. Under the Magnuson-Stevens Act, once a regional fisheries management Council recommends an FMP or FMP amendment to NMFS, only the Secretary (acting through NMFS) has the authority to approve and implement it through regulations.[223] Humbyrd Plaintiffs allege that recommendations made by a Council are "proposals" in name only, and NMFS may only block a proposal from the Council if it violates federal law.[224] Humbyrd Plaintiffs allege that the Council is *de facto* in charge of making policy decisions and implementing regulations.[225] But a Council's proposal has no legal effect whatsoever without the agency first promulgating implementing regulations.[226] The Secretary has wide discretion to deny a proposed FMP or plan amendment if it is inconsistent with the National Standards or other applicable laws.[227] The Secretary also must determine whether regulations proposed by the Council

---

[222] *See* Docket 37-1 at 2; Docket 37-2 at 2; Docket 37-3 at 2.
[223] *See* 16 U.S.C. §§ 1855(c)–(d), 1852(h)(1), 1854(a)–(c).
[224] Docket 37 at 16.
[225] *Id.* at 15–16.
[226] *See Gulf Restoration Network, Inc. v NMFS*, 730 F. Supp. 2d 157, 174 (D.D.C. 2010) (finding plaintiffs did not have a cause of action to challenge an FMP where the Secretary did not issue implementing regulations); *Anglers Conservation Network v. Prizker*, 70 F. Supp. 3d 427, 436 (D.D.C. 2014) (finding the vote of a Council formed pursuant to the Magnuson-Stevens Act had no legal effect and therefore was not judicially reviewable), *aff'd* 809 F.3d 664 (D.C. Cir. 2016).
[227] *See* 16 U.S.C. § 1854(a).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment
Page 48

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 48 of 54

are consistent with the FMP, plan amendment, Magnuson-Stevens Act, and all other applicable laws before taking any rulemaking action.[228] This means that the promulgation of regulations ultimately lies within the discretion of the Secretary.

Federal Defendants argue that this Court is bound by the decision in *Northwest Environmental Defense Center v. Brennen*,[229] which involved an analogous situation. In *Brennen*, plaintiffs challenged the validity of regulations promulgated pursuant to the Magnuson-Stevens Act setting harvest limits for Oregon coastal coho salmon.[230] Plaintiffs disagreed with the regulations to the extent they set harvest levels too high and argued that they were invalid because "the composition of the Pacific Council violates the Appointments Clause and the principle of separation of powers."[231] The Ninth Circuit summarily dismissed these constitutional claims, citing plaintiffs' lack of standing, and found that "[w]hatever constitutional infirmity may inhere in the Council's structure has not caused the injury of which [plaintiff] complains . . . ."[232] It further found that "[a]lthough the Council proposed the challenged fishery regulations, those regulations were implemented by the Secretary after review."[233]

Humbyrd Plaintiffs argue that this Court should narrowly construe *Brennen* because the *Brennen* plaintiffs only challenged the constitutionality of state-appointed council members, whereas here Humbyrd Plaintiffs challenge the constitutionality of the

---

[228] *See* 16 U.S.C. § 1854(b).
[229] 958 F.2d 930 (9th Cir. 1992).
[230] *Id.* at 932.
[231] *Id.* at 937.
[232] *Id.*
[233] *Id.*

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                    Page 49

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 49 of 54

entire Council.[234] Humbyrd Plaintiffs distinguish *Brennen* on the basis of a single sentence in the opinion, in which the Ninth Circuit observed that redressability for purposes of Article III standing could not be established where plaintiffs did "not allege that plans proposed by a Council that did not include state-appointed members would provide for higher spawning escapement levels of OCN coho."[235] In other words, even if plaintiffs prevailed on their claim that state-appointed members of the Council were serving in violation of Constitutional removal protections, this finding would not lead to the relief that plaintiffs sought (*i.e.*, lower harvest goals). Even if *Brennen* turned on that finding, the same could be made here. Humbyrd Plaintiffs do not allege that a differently structured Council would have voted against the closure of the Cook Inlet fishery to commercial salmon fishing. This Court cannot divine what a Council composed of other members would have proposed.

Humbyrd Plaintiffs also allege that *Brennen* has been overruled by subsequent Supreme Court decisions.[236] This simply is not true. Humbyrd Plaintiffs cite to *Collins v. Yellen*[237] for the proposition that "standing does not require tracing an injury to the unconstitutional structure of an official's position."[238] In that case, plaintiff shareholders sued the Department of Treasury ("Treasury"), alleging that the Federal Housing Finance Agency ("FHFA"), a congressionally created, independent agency,

---

[234] Docket 58 at 8–9.
[235] *Id.* at 8 (quoting 958 F.2d at 937).
[236] Docket 58 at 9.
[237] 141 S. Ct. 1761 (2021).
[238] Docket 58 at 10 (citing *id.* at 1779).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                      Page 50

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 50 of 54

illegally changed how private shareholders of certain companies were compensated when those companies profited. Plaintiffs argued that the structure of the FHFA was unconstitutional because restrictions on the President's authority to remove the director of the FHFA violated the separation of powers.[239] The injury identified by plaintiffs was the economic losses to shareholders effectuated by the change—amendment three—implemented by the FHFA.[240] The Supreme Court found that the shareholders' injury was "traceable to the FHFA's *adoption and implementation* of the third amendment," which was "responsible for the variable dividend formula that swept the companies' net worth to Treasury and left nothing for their private shareholders."[241] The shareholders thus had standing to pursue their removal protections claim. This is different from the case here, where the Council did not promulgate the Final Rule that inflicted the purported injury to Humbyrd Plaintiffs. *Yellen* has no effect on the analysis in *Brennen* because *Yellen* does not change the fact that Councils under the Magnuson-Stevens Act are simply advisory bodies and have no legal authority. In short, the Council's composition and the Council's proposal of Amendment 14 is not the cause of Humbyrd Plaintiffs' alleged injuries.

### 3. Redressability

For the same reasons Humbyrd Plaintiffs cannot demonstrate causation, redressability cannot be established. A plaintiff bears the burden of establishing that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable

---

[239] 141 S. Ct. at 1775.
[240] *Yellen*, 141 S. Ct. at 1779.
[241] *Id.* (emphasis added).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 51

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 51 of 54

decision.[242]  In terms of relief from this Court, Humbyrd Plaintiffs request "a declaration that the *regulation* is unconstitutional and a permanent prohibitory injunction setting aside the *regulation*."[243]  This requested relief further demonstrates that Humbyrd Plaintiffs' alleged injuries stem from the Final Rule, promulgated and implemented by NMFS, rather than the Council's proposal of Amendment 14.  NMFS underwent a separate rulemaking process—mandated and regulated through judicial review via the APA—in which it engaged in its own analysis and assessment, prior to promulgation of the regulation; this is the only action that had any impact on Humbyrd Plaintiffs' ability to engage in commercial salmon fishing in the Cook Inlet fishery.  If this Court granted Humbyrd Plaintiffs' proposed remedy, *i.e.*, vacatur of the Final Rule, the constitutional issues they raise regarding the makeup of the Council would not be redressed.  Because the Council has no authority to promulgate regulations, there is no action taken by the allegedly unconstitutional body that can be redressed by this Court with either declaratory or injunctive relief.

In summary, this Court finds that Humbyrd Plaintiffs, at minimum, cannot establish causation or redressability and therefore do not have standing to pursue their constitutional claims.  The Court dismisses this action without prejudice as to Humbyrd Plaintiffs.

---

[242] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).
[243] Docket 36 at 2 (emphasis added).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 52

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 52 of 54

**E.      Supplemental Briefing is Necessary to Determine an Appropriate Remedy, Beyond Vacatur**

As described above, the Court finds that NMFS's Final Rule is arbitrary and capricious and not in accordance with law pursuant to the APA.[244]  Federal Defendants request the opportunity to brief remedy, and UCIDA Plaintiffs appear to agree that supplemental briefing, as well as an opportunity to meet and confer with Federal Defendants, is needed.  However, UCIDA Plaintiffs insist that immediate vacatur of the Final Rule is necessary.  The Court agrees that "[t]he ordinary practice is to vacate unlawful agency action."[245]  Federal Defendants have not provided any reason why vacatur at this juncture is inappropriate,[246] and the Court finds that the urgency of the impending fishing season necessitates immediate relief.  Any interim measures will take time to implement and potentially lead to disruptive consequences for the fishermen who ultimately answer to the agency's decision-making.[247]  The Court finds it appropriate to immediately vacate Amendment 14 and its Final Rule.

## V.   CONCLUSION

For the foregoing reasons, Humbyrd Plaintiffs' Motion for Summary Judgment at Docket 36 is **DENIED**.  UCIDA Plaintiffs' Motion for Summary Judgment at

---

[244]  *See supra* sections IV.A.1.–2. of this Order.
[245]  *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)).
[246]  *See Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019) ("Because vacatur is the default remedy . . . defendants bear the burden to prove that vacatur is unnecessary.").
[247]  *See Int'l Union, United Mine Workers of America v. Mine Safety and Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990) (describing factors relevant to a Court's decision whether to vacate an arbitrary and capricious agency action).

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                    Page 53

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 53 of 54

Docket 38 is **GRANTED**. Federal Defendants' Cross Motion for Summary Judgment at Docket 53 is **GRANTED IN PART** and **DENIED IN PART**.

The Final Rule at 86 Fed. Reg. 60, 568, promulgated on November 3, 2021, is **VACATED**. This matter is **REMANDED** to the agency for further proceedings consistent with this Order. The parties shall meet and confer and propose a briefing schedule to this Court on or prior to August 21, 2022. Such briefing shall include the appropriateness of other relief requested in Plaintiff UCIDA's Complaint.

IT IS SO ORDERED this 21st day of June, 2022, at Anchorage, Alaska.


*/s/ Joshua M. Kindred*

JOSHUA M. KINDRED
United States District Judge

*United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Case Nos. 3:21-cv-00255-JMK, and 3:21-cv-00247-JMK CONSOLIDATED
Order on Cross Motions for Summary Judgment                                                    Page 54

Case 3:21-cv-00255-JMK   Document 67   Filed 06/21/22   Page 54 of 54